|2REMY CHIASSON, Judge, Pro Tern.
Plaintiff, Manuel Creppel, injured his back on August 6,1992 while working as a tugboat captain aboard the vessel MTV John 1:1. The vessel was owned by American Tugs, Inc., which was owned by Autrey Dufrene. Plaintiff filed his Jones Act[1] claim in state court against the MTV John 1:1 in rem and American Tugs in personam. After a bench trial, the trial court issued a judgment on December 20,1994, finding the plaintiff 50% at fault for his injuries, due to his knowledge of the boat’s condition, his responsibility as captain of the vessel to keep the vessel in seaworthy condition, and his failure to discover and correct the unseaworthy condition. The court awarded the plaintiff $400,000.00 in damages, subject to the 50% reduction. The judgment also awarded plaintiff court costs and interest from the date of judicial demand. Creppel filed a Motion for New Trial, urging the trial court’s error in applying the primary duty doctrine and seeking an addi-tur. The trial court thereinafter rendered an amended judgment on March 20, 1995, increasing plaintiff’s damage award to $500,-000.00, subject to the 50% reduction for plaintiff’s comparative fault.
Creppel moved for a devolutive appeal on April 12, 1995. On April 20, 1995, plaintiff acknowledged the receipt of defendant’s unconditional tender in satisfaction of judgment, preserving plaintiffs right to appeal. On appeal, plaintiff argues that the court erred in finding him 50% comparatively at fault for his injuries, and asks that the quantum be increased.
For the reasons assigned below, we reverse the judgment of the trial court, finding defendant 100% at fault for plaintiffs damages. We affirm the award of damages, now subject to no reduction for plaintiff negligence.

FACTS

Manuel Creppel was employed by defendant American Tugs as the captain of the M/V John 1:1, a tow boat. He had worked for defendant intermittently for a number of years and had captained this vessel when she was new. The accident that caused his injuries happened when Creppel was in the engine room assisting the deckhand in changing the engine oil of the boat’s two diesel engines. Plaintiff fell when an angle iron supporting the metal plate he stepped on broke, causing the metal plate to bow. He finished the oil change, but began complaining of back *376 pain shortly thereafter. At the time of the accident, plaintiff was forty-six years old.
The engine room deck plates were ¾6" aluminum square plates that were suspended above the bilge by angle irons. Captain Creppel and the crew noticed the unsteadiness and bowing of the plates following the replacement of the vessel’s old Caterpillar engines with new Cummins engines in January, 1992. The new engines were smaller than the old ones, and their installation required the modification of the deck plating and the angle iron supports. The deck plates were also loose; that is, they were not screwed or bolted down, and could be lifted to access the bilge beneath. According to Creppel and some of the crew, the deck plates were included on a repair list compiled by Creppel for attention during the boat’s drydoek for repairs in July, 1992. However, Autrey Dufrene, the owner of John 1:1 and the person who had made the modifications in the engine room, denies ever seeing such a list or being told by Creppel of the bowing deck plates. At this time, Dufrene made repairs to the boat’s steering mechanism, installed a catwalk on the wheelhouse, and undertook other repairs. It does not appear that the deck Uplating or angle irons were addressed. Within one month of the drydoek repairs, Creppel slipped and fell, while carrying a five gallon bucket of engine oil, when the angle iron holding the deck plate broke. After Creppel’s accident, the deckhand David Prestenback (the only certified welder on board), found that the weld in the angle iron had been saw-cut and had caused the angle iron to break. He repaired the broken angle iron and discovered several others that he also repaired.
After approximately a year of unsuccessful conservative treatment, plaintiff underwent surgery to perform a three level spinal fusion.

ANALYSIS

Plaintiff contends that the court erred in applying the primary duty doctrine to reduce his recovery.
Under the Jones Act, while a seaman has a duty to protect himself, the duty is slight. Osorio v. Waterman S.S. Corp., 557 So.2d 999 (La.App. 4 Cir.1990). However, a seaman’s comparative fault can be used to reduce a shipowner’s liability. McCoy v. United States, 689 F.2d 1196 (4th Cir.1982). The defendant has the burden of proving that plaintiff was contributorily negligent and that such negligence was a proximate cause in producing his injuries. Collins v. Texaco, Inc., 607 So.2d 760 (La.App. 1 Cir.1992). To establish contributory negligence in a maritime setting, there must be evidence of a negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition. Id. at 767.
The primary duty doctrine, broadly stated, bars a plaintiffs recovery if his injury arises from an unseaworthy condition created by the seaman’s own breach of a contractual duty which he has consciously assumed as terms of his employment. Id. at 765, citing Walker v. Lykes Bros. Steamship Co., 193 F.2d 772 (2d Cir.1952); Bernard v. Maersk Lines, Ltd., 22 F.3d 903 (9th Cir.1994). The majority rule is that the doctrine applies only to officers and not unlicensed seamen. Bernard v. Maersk Lines, Ltd., supra. Kelley v. Sun Transportation Co., 900 F.2d 1027 (7th Cir.1990) added a fourth criterion: that the negligence of the claimant was the sole cause of his injury — the doctrine does not apply |sif negligence of the employer contributed to the cause.
In a bench trial of an admiralty claim, the question of contributory fault is treated as a question of fact, the finding of which should not be overturned on review unless clearly erroneous. Danos v. McDermott, Inc., 563 So.2d 968 (La.App. 1 Cir.1990).
After reviewing the record, we find that the trial court did not apply the primary duty doctrine, because such an application would have completely barred any recovery by plaintiff. We disagree with the court’s finding that Captain Creppel’s responsibility as captain of the vessel to keep the vessel in seaworthy condition included knowledge of this particular defect and responsibility therefore.
Creppel testified that he was responsible, as captain of the vessel, for maintaining safe *377 conditions on board and seeing to repairs. Autrey Dufrene testified that Creppel was one of his best captains. He specifically said that he believed plaintiff to be very hardworking and honest. Creppel helped the deckhands perform most of the maintenance work, something that was not specifically required, according to relief captain Jerry Leeper. The captain and crew had noticed the deck plates bowing since the engine replacement in January, 1992. Captain Crep-pel performed none of the work replacing the engines, and testimony reflects that this was not his responsibility. Although Creppel and the crew testified that Creppel’s repair list for July 1992 included the deck plates, Du-frene denies that he was ever informed of this condition. It appears that the bowing was not fixed in July with the other repairs. During this repair session, all welding was performed principally by Dufrene and his son, with occasional pieces done by Presten-back.
Captain Creppel was not a welder, and testified that he did not know how to use the welding machine. Much testimony was devoted at trial to whether the captain ever welded on the ship, and whether he had authority to order Prestenback to perform welding repairs. Everyone agreed that welding was never done in the engine room while the boat was underway. Testimony diverged on the issue of whether welding was safe while the boat was in the water (though docked) and when the bilge was not cleaned or the boat gas free, or whether welding should only be performed when the boat was drydoeked and the bilge ledeaned. Captain Creppel felt that welding in the engine room over a “dirty” bilge was an unsafe practice that he would have never ordered a crewman to perform, because of the fire hazard. He agreed, though, that he did have a welding machine on board and that he did have the authority to order Prestenback to make minor repairs. However, plaintiff stated that he did not have authority to make repairs or modification without Dufrene’s permission or approval.
Creppel testified that while he knew that there was a problem with the bowing deck plates, he did not know the specific nature of the problem, the weakened angle iron and the cuts. He said that he had felt the deck plates bowing, but on the day of the accident actually felt the weld break when he stepped on it. Previous to the accident, he had removed deck plates to perform work in the bilge, and had looked at the angle irons to try to discover a cause to the bowing, but had not discovered that the welds were either broken or cut. Both Creppel and Presten-back testified that the specific problem with the angle irons was not discoverable by mere sight, but was only known when each of them actually pushed on the angle iron and caused it to move, which was possible after it broke. It is true that Prestenback was able to see the saw-cut, but testimony showed that as an experienced welder, he knew the significance of this whereas Captain Creppel might not. The plaintiffs expert witness, a naval architect, testified that the cut in the angle iron changed it from being a continuous structure from one side of the floor to another, which rendered virtually no support for the deck plate itself, depending on where one stepped.
Prestenback testified that he had repaired a different angle iron approximately one month prior to Creppel’s accident. He said that he did not feel he had to ask the captain’s permission to perform such a repair. He also testified that he repaired the angle iron that broke under Creppel’s weight shortly after the fall, and without the specific permission of the captain. Prestenback placed plywood in the bilge and used a fire watch while welding the angle irons.
While it was not specifically addressed, it appears that the cuts in the angle irons were made when the vessel’s engines were replaced. Captain Creppel performed none 170Í' that work. This work was performed either by Dufrene himself or at his direction. The record contains testimony establishing that cutting the angle irons in the way that was found would weaken them, causing them to eventually break. Thus, Dufrene’s actions are the primary cause of the accident.
The above testimony and evidence shows that Creppel was a very conscientious captain who was very involved in the maintenance of his vessel. While he had knowledge of a problem with the deck plate bowing, he *378 could not discover the specific defect, even after inspecting the angle irons. He certainly cannot be held responsible for the angle iron breaking after it had been saw-cnt by the owner. The evidence shows that Captain Creppel did not have responsibility to make major repairs or modifications to the vessel. The evidence also shows that he made several efforts to discover the cause of the bowing, but was unsuccessful. We believe that Captain Creppel was not negligent in the performance of his duties (indeed, the universal testimony establishes his high level of care and conscientiousness in this regard), and that his actions or failure to act in no way caused or contributed to his injuries. A captain of a vessel is not responsible for the structural integrity of a vessel and that responsibility cannot be contracted to him.
Next, plaintiff contends that the trial court awarded inadequate damages. As our Supreme Court stated in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993):
"... [T]he discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.”
Plaintiff testified that his injury caused him severe pain almost immediately, though he did not seek medical attention for several days, thinking that he had merely a temporary condition. Creppel had in fact suffered a low back injury that later necessitated a three level spinal fusion at L3-4, L4-5, and L5-S1. His treating orthopedic surgeon, Dr. Robert Fleming, testified that he used lumbar screws, sacral screws, rods, and bone grafts | ato complete the fusion. Dr. Fleming testified that this surgery was more complicated than the normal laminectomy. He gave plaintiff an anatomical disability rating of 20-25% and recommended that plaintiff not engage in work that required repeated lifting, bending, stooping, or climbing. The surgery brought noticeable relief for plaintiff’s pain, according to the doctor’s note of how much pain medicine plaintiff used before surgery and after. The doctor testified that the fusion was successful, and no further surgery was warranted unless plaintiff experienced discomfort from the hardware in his back.[2]
Creppel testified that he was unable to return to work after the accident because of the pain. Before the accident, he described himself as being very healthy and very conscious of his fitness. The crew members corroborated this description. He testified that he cannot perform many of the activities that he could prior to the accident, like yard-work, fixing up old cars, playing with his grandchildren. Plaintiff’s wife testified that he gets depressed, grouchy, and moody, which he did not do before the accident. Although the surgery did relieve much of his pain, he is still restricted in what he can do. At trial, plaintiff said that his back had been doing well until he saw a Social Security doctor, whose exam caused him to experience pain again. (Dr. Fleming noted that the Social Security doctors tended to be rough on patients).
Plaintiff’s award of $500,000.00 was not broken down by the court into specific awards for pain and suffering, past lost wages, or future lost wages. Dr. Kenneth Boudreaux, an economic expert, testified that Creppel’s past lost wages fell within the range of $55,000.00 to $72,000.00. Thus, the court’s award leaves room for general damages and future lost wages of $428,000.00 to $445,000.00. The calculations regarding future lost wages varied widely. All of these calculations were based upon the assumption that Captain Creppel would be either unable to return to work at all, or would return to work at a substantially lower income. However, plaintiffs doctor testified that the surgical result was excellent, and he believed *379 Creppel could return to work as a boat | scaptain or pilot on a larger vessel that did not require much of the physical work plaintiff performed on the M/V John 1:1. Dr. Boudreaux testified that if plaintiff was to return to work at half of his past income (which averaged $43,400.00 for the five years prior to the accident), his future lost wages would be between $140,000.00 and $160,-000.00. No final conclusion was reached regarding whether plaintiff would return to work and at what level of income. Subtracting this from the damage award less the past lost wages, this leaves at the least a general damage award of $268,000.00.
Plaintiff cites Use v. Use, 654 So.2d 1355 (La.App. 1 Cir. 4/7/95) for the proposition that a general damage award of anything less than $250,000.00-$300,000.00 is inadequate. However, a review of other cases involving spinal injuries and fusion surgeries show that the range goes as low as $100,000.00[3]. Considering the trier of fact’s vast discretion in determining the proper damage award, we cannot say that the trial court’s award of $500,000.00 was an abuse of discretion. Therefore, we decline to disturb this award.
In conclusion, we reverse the judgment of the trial court, finding defendant 100% at fault for the cause of plaintiffs injuries. We affirm the award of damages of $500,000.00, noting that it is now not subject to any reduction for comparative fault. All cost of this appeal are taxed to defendant.
REVERSED IN PART AND AFFIRMED IN PART.

. 46 U.S.C. Sec. 688.

. At the hearing on the Motion for New Trial, plaintiff’s counsel stated that Creppel had undergone the hardware removal since trial.

. See Danos v. McDermott, Inc., 563 So.2d 968 (La.App. 1 Cir.1990) (lower back injury, one surgery including fusion, 30% permanent physical impairment, general damages of $140,000.00); Hurst v. Drusilla Seafood of Hammond, 616 So.2d 749 (La.App. 1 Cir.1993) (lumbar discecto-my and subsequent lumbar fusion, 15-20% disability, $100,000.00 in general damages); Collins v. Texaco, Inc., supra (lumbar laminectomy and subsequent lumbar fusion, allowed to return to work with restrictions, $120,000.00)