751 So.2d 949 (1999)
Cynthia Ballard TAYLOR and Robert Taylor, Jr.
v.
TULANE MEDICAL CENTER, et al.
In re Cynthia Taylor Applying for Medical Review Panel.
Cynthia B. Taylor, et al.
v.
Tulane University of Louisiana, et al.
Nos. 98-CA-1967 to 98-CA-1969.
Court of Appeal of Louisiana, Fourth Circuit.
November 24, 1999.
Opinion Granting Rehearing January 31, 2000.
*952 Corinne Ann Morrison, James C. Young, Lou Anne Milliman, Chaffe, McCall, Phillips, Toler & Sarpy, L.L.P., New Orleans, Louisiana, Counsel for Defendants-appellees.
Harry T. Widmann, Metairie, Louisiana, Counsel for Plaintiff-appellants.
Court composed of Judge WILLIAM H. BYRNES, III, Judge MIRIAM G. WALTZER, Judge JAMES F. McKAY, III.
BYRNES, Judge.
Plaintiff[1], Cynthia Taylor sued the Tulane Medical Center (Tulane) for damages allegedly sustained as a result of a negligently administered Demerol injection.[2] Her husband, Robert Taylor, Jr., sued for loss of consortium. Plaintiffs[3], Mr. and Mrs. Taylor settled with Tulane for $75,000.00, "plus other considerations in excess of $25,000.00, reserving their rights against the Louisiana Patients Compensation *953 Fund Oversight Board and the Louisiana Patients Compensation Fund, hereinafter referred to collectively as the "PCF."
A jury found that Tulane's negligence caused Mrs. Taylor's injuries. The PCF[4] has not appealed liability. The jury found for Mrs. Taylor and made a lump sum award in the amount of $165,000.00 covering all of her damages. The jury also awarded her husband, Mr. Robert Taylor, Jr. the sum of $35,000.00 for loss of consortium. Judgment was signed on November 26, 1997, "subject to any amount previously paid ..." In answer to jury interrogatories the jury found that more likely than not, Cynthia Taylor would require future medical care. Plaintiffs filed a post-trial motion for JNOV which was denied. The PCF filed a motion to amend judgment or in the alternative for new trial for reargument only on the issue of whether the PCF was entitled to $100,000.00 credit under the Louisiana Medical Malpractice Act for the $75,000.00 received in the settlement with Tulane. On December 8, 1997, the trial court entered an order stating that: "The court will amend judgment on its o[w]n motion in order to conform with the provisions of the Medical Malpractice Act."[5] The plaintiffs appealed, but did not appeal the December 8 order amending the judgment to give the PCF $100,000.00 credit for the $75,000.00 settlement. The PCF filed an answer to the appeal which was initially refused as untimely. The PCF filed a motion asking this Court to allow the answer to be filed which was opposed by the plaintiffs. This Court granted the PCF's motion but reserved to the plaintiffs the right to assert their opposition again at oral argument.
DEFENDANT'S ANSWER TO THE APPEAL.
The plaintiffs contend that the defendant's answer to the appeal was untimely. On May 8, 1998, plaintiff timely filed a Motion and Order for Devolutive Appeal. This Order provided that the appeal would be returnable 45 days after all costs are paid. Pursuant to a notice of costs due, plaintiff paid costs on June 3, 1998, within the time allowed by the notice. On August 10, 1998, three volumes of pleadings were lodged with this Court. However, the exhibits and the eight volumes of trial transcript were not filed until February 18, 1999, through no fault of the defendant/appellee. On February 3, 1999, the Clerk of the Civil District Court sent notice to appellant to pay additional appeal costs of $615.60, which notice was filed in this Court on February 5, 1999. Plaintiffs do not contest the fact that these additional costs were not paid until on or about February 11, 1999. Defendant contends that pursuant to the trial court's order of May 8, 1998, the return date is 45 days from February 11, 1999, the date the plaintiffs paid the additional $615.60 in costs, i.e., March 29, 1999. Accordingly, the defendant contends that the filing of its answer by mail on March 8, 1999, is timely. In the alternative, the defendant argues that the record was not complete for purposes of LSA-C.C.P. art. 2133 until the transcript was filed on February 18, 1999. We agree. Deutsch, Kerrigan & Stiles v. Rault, 389 So.2d 1373, 1375 (La.App. 4 Cir.1980), writ den. 396 So.2d 883 (La. 1981).
In the instant case the entire lengthy trial transcript was not filed until February 18, 1999. In Rault this court allowed *954 the appellee to file an answer based on the timing of the late lodging of only one volume out of three of the appellate record, rather than the timing of the earlier filing of the two other volumes. In Ventress v. Union Pacific R. Co., 95-1240 (La.App. 4 Cir. 12/28/95); 666 So.2d 1210 reversed in part and remanded, 96-0501 (La.5/3/96); 672 So.2d 668, this Court found that the late filed portions of the record were minimal which, along with the fact that the appellant alleged no prejudice, was sufficient grounds to justify requiring that the timing of the answer be dated from the earlier filing. The facts in the instant case where all eight volumes of trial transcript were filed late are even more favorable to the appellant than those of Rault wherein we allowed the timing of the answer to be based upon the completion of the filing of the appellate record. Accordingly, we find that the appellee's answer is timely.

FAILURE TO MITIGATE
The defendant argues that plaintiffs' recovery should be reduced because of the failure of the plaintiff to mitigate damages. Plaintiffs contend that it was error for the trial court to allow the jury to consider failure to mitigate. Plaintiffs contend that the failure to mitigate is an affirmative defense. Hanks v. Wilson, 93-0554 (La.App. 1 Cir. 3/11/94); 633 So.2d 1345, 1348. The PCF does not contest the fact that it failed to plead mitigation. Rather, the PCF contends that it introduced evidence of mitigation and that its pleadings should be treated as having been amended to conform to the evidence. LSA-C.C.P. art. 1154. The plaintiffs also complain that the trial court's instruction to the jury on failure to mitigate failed to instruct the jury that the burden of proof on that issue lies with the defendant and, therefore, was prejudicially erroneous. Jacobs v. NOPSI, 432 So.2d 843 (La.1983). The defendants do not dispute the fact that they bear the burden of proof on the question of failure to mitigate.
On the question of the failure to mitigate the PCF argued that: "The jury could have reasonably concluded that the reason for the lengthy delay in reentering the work force was the plaintiff's addiction to prescription drugs such as Vicodin and Valium." Drs. Sanders, Anastio and Morse testified that these medications are recognized as appropriate for treating patients with chronic pain such as that experienced by Mrs. Taylor. The defendants do not contend otherwise. Nor do the defendants dispute the fact that at all times Mrs. Taylor took these medications as prescribed by her physicians. The defendants do not contend that there was any fraud or bad faith in the prescription or use of these medications either on the part of Mrs. Taylor or the prescribing physicians. The defendants have not argued that Mrs. Taylor took more than the prescribed dosages; nor have they argued that she lied to her treating physicians in order to feed her alleged addiction. We find that the use of prescribed medications does not constitute a failure to mitigate in the absence of bad faith, fraud, or a showing that the medication was not taken as directed. Mrs. Taylor is only required to take reasonable steps to mitigate damages. Jacobs v. NOPSI, 432 So.2d 843 (La.1983). There is nothing in the record to suggest that Mrs. Taylor, as a lay person, was unreasonable in taking drugs prescribed for her by physicians. The defendants base their argument solely on the observation that: "Once Mrs. Taylor entered a rehabilitation clinic and stopped taking these drugs, she was able to return to work at a salary higher than she had enjoyed prior to the accident." But the mere fact that Mrs. Taylor's condition may have improved once she stopped taking certain pain killers is not proof that she was unreasonable for that period of time during which she was taking them as prescribed. Based on this line of reasoning, an injured party could be found to have failed to mitigate damages any time it could be shown after the fact that a different course of treatment or a different prescription *955 might have produced better results. Hindsight is 20-20, but Mrs. Taylor is not held to a standard of hindsight. She is held to a standard of reasonableness. Therefore, we reject the defense of failure to mitigate.
The trial court issued the following jury instruction on the issue of failure to mitigate:
An injured party is required to take reasonable steps to exercise ordinary prudence to minimize damages. In this case, Plaintiff should have exercised the degree of care to minimize her damages that would be taken by an ordinary prudent individual under the same or similar circumstances.
The reasonable care depends upon the circumstances including the time available to the Plaintiffs to minimize their damages, Plaintiffs [sic] knowledge and opportunity to minimize their damage, that further loss to which Plaintiffs would be [sic] if they fail to minimize damages, and the expense required for the Plaintiffs to minimize their loss. [Emphasis added.]
The plaintiffs complain that the language highlighted in the jury charge quoted above "tells the jury that Ms. Taylor did not mitigate damages." The language complained of by the plaintiffs does not state that the plaintiff failed the proper standard of care any more than the instruction that, "In a malpractice case the skill and care of the health care provider is presumed to be appropriate in the absence of evidence to the contrary," directs the jury to find that the defendant was not liable. This becomes clearer when the offending phrase is read in the context of the jury charge as a whole where such phrases as "reasonable steps," "exercise ordinary prudence," "would be taken by an ordinary prudent individual," "reasonable care depends on the circumstances," and "Plaintiffs knowledge and opportunity to minimize their damage" make it obvious that the jury is being instructed that the plaintiff is required to do only what is reasonable to mitigate damages. Therefore, to the extent that the question of failure to mitigate may not have been properly before the jury, we find the error to be harmless.
The plaintiffs also complain that they proposed a jury instruction containing a proper explanation of the law relative to the plaintiff's obligation to mitigate damages, including the burden of proof, but that the trial court erroneously rejected it. In making charges to a jury, a trial judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the applicable law in light of the facts of the particular case. Goodman v. Allstate Ins. Co., 98-732 (La.App. 5 Cir. 5/19/99); 736 So.2d 310, writ den. 99-1788 & 99-1793 (La.10/1/99); 748 So.2d 450. In Goodman the appellate court noted that the:
[J]ury charge shows several inadvertent instructions; for example, one charge suggested that the plaintiff had to prove negligence while several other charges stated that Goodman had an obligation to mitigate damages although there was no testimony that he did not mitigate damages. [Emphasis added.] Allstate did not allege failure to mitigate.
* * * * * *
No doubt Goodman was injured on November 15, 1989. The issues in this trial were medical; i.e., to what extent was he injured and to what degree were his pre-accident injuries/symptoms aggravated. The trial judge's charge, while perhaps not perfect, nevertheless, considered in its entirety, rationally and judiciously spelled out what this case was about and what the jury had to decide. In any event, we cannot say that any instruction, alone or combined with others, was so misleading that it or they contributed inequitably to the verdict.
*956 The jury instructions complained of in the instant case seem to be much more limited and much less egregious than those complained of in Goodman. We find that under the mitigation instruction as given, the jury would not have found that the plaintiff failed to mitigate. Therefore, if the trial court erred in failing to give the plaintiffs requested jury charge on failure to mitigate, it was harmless error. The reviewing court must exercise great restraint before reversing a jury verdict on the grounds of erroneous jury instructions. Riley v. Reliance Ins. Co., 97-0445 (La. App. 4 Cir. 11/19/97); 703 So.2d 158, 167-168, writ den. 98-0283 (La.3/20/98); 715 So.2d 1220. The question to be determined is whether the jury is misled to the extent that it was prevented from dispensing justice. Id. We find that in the instant case the jury was not so misled.

FAILURE TO STRIKE THE TESTIMONY OF THE ECONOMIST FOR THE DEFENSE, KENNETH BOUDREAUX, PH.D.
The plaintiffs contend that it was error for the trial court to deny their motion to strike the testimony of Kenneth Boudreaux, Ph.D., the expert economist called by the defendants to testify regarding the plaintiffs loss of earning capacity.
Dr.Boudreaux projected the plaintiffs loss of earnings capacity using the average of earnings for the 2½ year period preceding her injury as the starting point. Plaintiffs contend that using such an average is erroneous as a matter of law and, therefore, the trial court should have relied on the testimony of their expert, Dr. Melville Wolfson. Accordingly, plaintiffs contend that Dr. Boudreaux's testimony should have been stricken. However, we note that when these same two experts squared off in Jones v. Sampey Brothers General Construction, Ltd., 544 So.2d 1192 (La. App. 5 Cir.1989), the court specifically rejected Dr. Wolfson's use of the plaintiff earnings immediately prior to injury, preferring instead to adopt as it base for calculations the two year average employed by Dr. Boudreaux, stating that it was "more reasonable." Id., 544 So.2d at 1192. By this we do not mean to imply that Dr. Boudreaux's averaging method must be used in all cases any more than we hold that Dr. Wolfson's approach must be necessarily rejected in all cases. These two experts meet in court so often, we could likely find cases going both ways.
Plaintiffs assert that loss of earnings capacity is not measured by what the plaintiff earned prior to injury, citing Folse v. Fakouri, 371 So.2d 1120 (La.1979). But what Folse really said is that although earnings at the time of injury are not necessarily determinative of the future ability to earn, they are relevant. Thus the choice of which approach to adopt is normally within the broad discretion of the fact finder. Plaintiffs contend that this error is compounded as a matter of law because Dr. Boudreaux's use of the average of the plaintiffs earnings for the 2½ years preceding her injury fails to take into account the fact that:
As people progress with their careers, their earning capacity typically increases. If we average in past years, then the average would not accurately reflect current earning capacity as of the date the disability starts.
This is an excellent argument of that should be weighed by the fact finder, but it is not a fixed legal standard that a jury is mandated to adopt. The plaintiffs have cited no authority requiring its use as the exclusive method. In effect, plaintiffs contend that earnings capacity should be based on an accident day snapshot of earnings, unless of course plaintiffs can show higher earnings on any other day. Earnings capacity should reflect a consistent ability to earn money. Earnings over a period of time are, therefore, relevant, although not necessarily conclusive. The fact finder is entitled to consider a broad range of evidence because there is no precise formula or measurement. While the plaintiffs are free to argue that their expert's *957 method of projecting earning capacity is superior to Dr. Boudreaux's projections using an averaging of prior income as a starting point, this does not mean that Dr. Boudreaux's testimony is either irrelevant or immaterial. The projection of earnings capacity is inherently speculative in nature. In the absence of manifest error, it is within the prerogative of the fact finder to decide whether the estimate of this imprecise number is best arrived at by reference to an average prior income figure for a certain period of time. It then becomes the job of the plaintiff to introduce evidence and argument that would persuade the fact finder that another method of calculation is more accurate under the circumstances.[6]
Earnings capacity represents what the plaintiff is able to earn, which may substantially exceed what plaintiff was actually earning at the time of injury. For example, if a successful brain surgeon decides to try his hand (unsuccessfully) as a professional tennis player, the law recognizes that he still has the capacity to resume the practice of medicine. Therefore, if that brain surgeon sustains an injury for which a third party is responsible, which injury prevents him from returning to his career as a brain surgeon, the law recognizes that as an element of loss for which he has a right of recovery. Thus the law relating to loss of earnings potential does not penalize a plaintiff for exercising the right to be voluntarily underemployed at the time of injury. An even more common example is that of a woman who voluntarily leaves the work force to raise a family. In doing so it cannot be said that she has lost the capacity to earn a living. Plaintiff's earnings at the time of injury are relevant, but not necessarily determinative of her future ability to earn. Id. A plaintiff's earnings history before an injury is an important factor in determining lost earnings capacity at trial. Hoskin v. Plaquemines Parish Government, 97-0061 (La.App. 4 Cir. 12/1/97); 703 So.2d 207, writ denied 98-0270, 0271 (La.4/3/98); 717 So.2d 1129. Future income is speculative in nature and cannot be calculated with mathematical certainty. Hoffman v. Travelers ins. Co., 587 So.2d 143 (La.App. 4 Cir.1991). Accordingly, the trier of fact has discretion in fixing awards for loss of earnings capacity. Martino v. Sunrall, 619 So.2d 87 (La.App. 1 Cir.), writ denied 621 So.2d 821 (La.1993).
We cannot say that Dr. Boudreaux's testimony was beyond the discretionary limit of what the jury was entitled to consider.

THE FAILURE OF THE TRIAL COURT TO INCLUDE A JURY INTERROGATORY ON MEDICAL EXPENSES.
The special verdict forms submitted by the trial judge to the jury failed to include a line for medical expenses. This was error. Shaw v. Bourn, 615 So.2d 466 (La.App. 4 Cir.1993), writ den. 618 So.2d 412 (La.1993).
The trial court gave the following instruction concerning the quantification of damages:
In determining an award, you should consider general damages and special damages. By general damages, we mean a sum of money you feel would fairly compensate the Plaintiff for the pain, suffering, mental anguish, and disability she has, or will probably in the future suffer as a result of the fault. In determining an award of special damages, we mean out of pocket or actual or anticipated loss, which the Plaintiff may have, or will probably sustain as a result of the accident. These may include damage to property, reasonable past *958 and future medical expenses[7], lost wages income and earning incapacity [sic]. [Emphasis added.]
Thus the jurors were instructed prior to deliberation to consider the question of plaintiff's medical expenses. The jurors apparently took this instruction to heart as is reflected in their responses to the polling done by the trial court quoted below.
When the jury returned with its verdict, it was read aloud to the trial court by the court crier:
MS. CRIER:
In the matter of Cynthia B. Taylor, et al versus Tulane University, et al. Case number 90-4840 consolidated with 91-786 consolidated with 91-20478. Jury Interrogatories. Do you find the preponderance of the evidence that the Tulane Medical Center nurse who administered the injection to Cynthia Taylor at 6:15 p.m. on May 31, 1989, was negligent by failing to use reasonable care?
A Yes.
If yes, please continue.
If no, date and sign this verdict from and return to the courtroom..
Number 2, do you find a preponderance of the evidence that Cynthia Taylor suffered sciatic nerve injury as a result of the injection she received at Tulane Medical Center at 6:15 p.m. on May 31, 1989?
A Yes.
Express in dollars, the total compensation, if any, that you will fairly compensate the Plaintiffs for the damages that they have sustained.
Cynthia Taylor, for pain, suffering, disability, mental anguish and emotional stress, loss of enjoyment of life and loss of earning capacity, past and future, one hundred sixty-five thousand. Robert Taylor, for the loss of consortium thirty-five thousand.
It is more likely than not that Cynthia Taylor will require future medical care.
A Yes.
New Orleans, Louisiana, this 20th day of November, 1997. Signed by Fore person Peggy W. Grandpre.
MR. WIDMAN
May we approach the bench.
OFF THE RECORD DISCUSSION
THE COURT:
Ladies and Gentlemen of the Jury, there appears to be one discrepancy, but I think we can resolve it rather quickly. There is an element of damages that was left off on the Jury Interrogatory Form. What I'm going to do is allow you to go back and deliberate on that medical damages.[8] And evidently somehow, in the preparation of the form that element was deleted. And I'm not going to recharge you. All I'm going to ask is keep in mind the charge I gave you. And considering whatever damages you feel are necessary to award whatever losses you feel you need to compensate for. Just keep the same principles in mind.
FOREPERSON:
Is that the same as punitive damages?
THE COURT:
No, it is not. Medical damages would beapproach just a minute.
OFF THE RECORD DISCUSSION
THE COURT:
The element that was left out is medical damages, or medical expenses. I'm not talking about punitive damages. The actual out of pocket medical cost that the Plaintiff[Emphasis added.]

*959 FOREPERSON:
We considered that.
THE COURT:
Mrs. Foreperson, the Court has brought to your attention that there is a discrepancy in the original Jury Interrogatory Form. And the Court feels that the element of damages of medical expenses may have been inadvertently [o]mitted. So, it is your feeling that the Jury has considered that amount in this award. As far as the Jury is concerned, this award includes any and all medical expenses, damages and any damages totally awarded?
FOREPERSON:
That's correct.
MR. WIDMANN:
Your honor, I think the question still needs to be answered. That's why it was suppose[d] to be on the Jury Interrogatory Form.
THE COURT:
I think they have.
MR. WIDMANN:
Please note my objection.
THE COURT:
Why don't you come up.
OFF THE RECORD DISCUSSION
THE COURT:
Ladies and Gentlemen of the Jury, it has been requested by attorney for Plaintiff that I poll the Jury. [Emphasis added.] I will ask each one of you, is this your verdict, and does it include every element of damage that you have decide[d] to award? Is that sufficient?
MS. MORRISION:
To include medical expenses, Judge?
MR. WIDMANN:
It helps, Judge. [Emphasis added.]
FOREPERSON:
Is there a difference between medical damages and medical expenses?[9]
[Emphasis added.]
MR. WIDMANN:
No, there is not.
THE COURT:
Juror Number One, would you stand. Is this your verdict, and does this verdict include any and all damages including medical damages that you would award?
JUROR NUMBER ONE:
Yes.
THE COURT:
Juror Number Two, is this your verdict, and does this verdict include any and all damages that you awarded including medical expenses?
JUROR NUMBER TWO:
Yes.
THE COURT:
Juror Number three, is this your verdict, and does it include any and all damages including medical damages that you awarded?
JUROR NUMBER THREE:
I thought that it was, Judge, but there seems to be a question around me. I was thinking that we needed to look at it again, but yes, the answer was yes, to what we understood.
THE COURT:
My question to you now is does this include any an[d] all damages, including medical damages, that you would award?
JUROR NUMBER THREE:
Yes.
THE COURT:
Juror Number Four, is this your verdict, and does it include any and all damages that you would award, including medical damages?
JUROR NUMBER FOUR:

*960 The answer would be yes.
THE COURT:
Juror Number Five, is this your verdict, and does it include any and all damages that you would award, including medical damages?
JUROR NUMBER FIVE:
No, it's not.
THE COURT:
Jury [sic] Number Six, is this your verdict, and does it include any and all damages that you would award, including medical damages?
JUROR NUMBER SIX:
Yes.
THE COURT:
Juror Number Seven, is this your verdict, and does it include any and all damages, that you would award, including medical damages?
JUROR NUMBER SEVEN:
It's medical expense that we had our discussion on. We did not do medical damages?[10] [Emphasis added.]
THE COURT:
Is this your verdict, and would this be your verdict?
JUROR NUMBER SEVEN:
I guess not.
THE COURT:
Juror Number Eight, is this your verdict, and does it include any and all damages that you would award, including medical damages?
JUROR NUMBER EIGHT:
Yes.
THE COURT:
Juror Number Nine, is this your verdict, and does it include any and all damages that you would award including medical damages.
JUROR NUMBER NINE:
Yes.
THE COURT:
Juror Number Ten, is this your verdict, and does it include any and all damages that you would award including medical damages?
JUROR NUMBER TEN:
Yes.
THE COURT:
Juror Number Eleven, is this your verdict, and does it include any and all damages that you would award including medical damages?
JUROR NUMBER ELEVEN:
Yes.
THE COURT:
Juror Number Twelve, is this your verdict, and does it include any and all element[s] of damages that you would award, including medical damages?
JUROR NUMBER TWELVE:
No.
THE COURT: Approach counsel.
OFF THE RECORD DISCUSSION
THE COURT:
Ladies and Gentlemen of the Jury, I want to thank you for your services. It was, indeed, a pleasure having you serve on this jury, you are hereby discharged.
When Juror Number Five responded "No" to the polling, because of the conjunctive nature of the question, he was not necessarily saying that the jury failed to consider medical expenses. It is just as likely that he disagreed with the verdict as a whole. The same can be said of Juror Number Twelve's negative response to the polling.
The Foreperson asked prior to the polling if there were any difference between medical expenses and medical damages. Juror Number Seven expressed a similar lack of certainty about the distinction between medical expense and medical damages when he stated during the polling *961 that the jury had discussed medical expense and not medical damage. This is clearly attributable to the fact that the instructions to the jury (quoted near the beginning of this section of this opinion) employed the term "medical expenses" rather than the term "medical damages." When reading the polling of Juror Number Seven, it seems that he may have responded "no" to the court's questioning because of this confusion rather than because he disagreed with the verdict or because he thought that the verdict failed to include medical expenses or damages. However, it is significant that the trial court did not press Juror Number Seven on this issue. Instead, he gave the plaintiff the benefit of the doubt and accepted the Juror's negative response at face value, in spite of the fact that it appears that Juror Number Seven may have been saying "no" meaning "yes."
Thus, the bottom line is that we have the requisite nine jurors expressing the conviction that this is their verdict and that it includes medical damages and expenses. Prior to the polling the foreperson of the jury declared without hesitation and unequivocally that the jury had considered the question of medical expenses in the computation of damages, and the polling confirmed that fact. None of the jurors stated that the verdict did not include medical expenses. Even Jurors Five and Twelve, who responded negatively, seemed to be saying more that they disagreed with the verdict rather than that the jury as a whole failed to consider the question of medical expenses in arriving at the verdict; not to mention the fact that when Juror Number Seven said "no" he probably really meant "yes." Therefore, by a conservative estimate we have nine firm "yes" votes, and no indication that the jury failed to consider medical expenses.
Owens v. Concordia Elec. Co-op, Inc., 95-1255 (La.App. 3 Cir. 6/25/97); 699 So.2d 434, cited by the plaintiffs is inapposite. In Owens the polling of the jury was far more extensive and intrusive, and it was just one of many errors committed by the trial court in the handling of the jury. The foreman was asked to break down the verdict and explain how it was arrived at. Also, unlike in the instant case the manner in which the polling was conducted resulted in an inconsistency between the verdict form and the trial court's polling results.
Finally, we conclude that the plaintiffs attorney waived this issue when he requested and agreed to the polling.[11] It is clear from the portion of the record quoted above that plaintiffs' attorney requested the polling solely out of his concern for the failure of the jury interrogatories to provide a separate question and line for medical expenses. When plaintiffs' counsel first objected to the interrogatories prior to the polling, he was objecting only to the form of the interrogatories. The prospect of polling the jury had not even been raised at that point in the proceedings. When, after an off the record discussion, the court suggested polling the jury, including the question of medical expenses, plaintiffs attorney responded: "It helps, Judge." Plaintiff's counsel made no objections to the polling during the course of the polling. The record reflects that after the polling was concluded, plaintiff's attorney objected, saying that he was unable to place his objection to the manner of polling on the record earlier because of the presence of the jury. However, this is inconsistent with his statement on the record that he felt that the polling "would help." Moreover, there was nothing preventing him from asking that the jury be excused and then making his objection on the record out of the presence of the jury. We do not believe that anything prevented him from making the objection on the record in the presence of the jury. Such an objection directed to a technical procedural issue should no more prejudice the thinking of the jury than countless other objections *962 routinely made in the presence of the jury. Plaintiff's brief makes no attempt to explain what prevented him from objecting in a timely manner. Plaintiffs' brief on appeal makes no argument that a contemporaneous objection would have somehow prejudiced the jury.
The plaintiffs' reference to objections to the polling that may have been made off the record can not be considered by this Court. This is a court of record. We conclude that the plaintiff's failure to object to the manner of polling the jury, either at the time it was announced by the trial court or at any time during the polling, along with plaintiffs' counsel's comment that such polling "would help," demonstrates that the plaintiff acquiesced in the manner in which the jury was polled.
Additionally, we find that the nature of the polling does not constitute an unwarranted intrusion into the privacy of the deliberations of the jury and does not constitute reversible error, even if we assume for purposes of argument that the plaintiffs' objection to the polling was timely and sufficient.
Finally, we conclude that the polling of the jury effectively cures any defect in the jury interrogatories arising out of the failure of the trial court to include a separate line item for medical expenses.

PAST MEDICAL EXPENSES
Where the plaintiff's evidence of medical expenses is uncontradicted, the failure of the jury to award the full amount is error. Nugent v. Continental Cas. Co., 93-867 (La.App. 3 Cir. 3/2/94); 634 So.2d 406, 411. Mouton v. Bonnett, 520 So.2d 1145 (La.App. 3 Cir.), writ and reconsideration denied, 521 So.2d 1138 (1988), writ denied, 522 So.2d 567 (La.1988). A trier of fact errs when it fails to award the full medical expenses proven by a victim. Carpenter v. Johnson, 95-0431, p. 8 (La. App. 1 Cir. 12/15/95); 664 So.2d 1354, 1358.
The plaintiff's evidence of the following past medical expenses was admitted without objection and the defendant offered no evidence in rebuttal. Argument of counsel, no matter how eloquent, is not evidence:
1. Dr. Kewalramani$1,971.00
2. Dr. John Olson$5,471.00
3. Dr. Oliver Sanders, Jr.$3,025.00
4. Dr. Roger Anastasio$3,660.70
5. Dr. Richard Morse$11,160.29[12]
6. Touro Infirmary$8,309.24
7. Dr. Friedman$100.00
8. Clearview Medical Imaging $1,100.00[13]
9. Mercy Hospital$440.00[14]
Total$35,237.23

FUTURE MEDICAL EXPENSES
In its answer to the appeal, the defendant contends that it was error for the jury to render any finding that the plaintiff will require future medical care, citing Kelty v. Brumfield, 93-1142 (La.2/25/94); 633 So.2d 1210; LSA-R.S. 40:1299.41, et seq. We find nothing in the record to indicate that the defendants raised this issue in the trial court. For example, the defendants made no objection on this basis to the jury instruction on future medical expenses, nor to the jury interrogatory asking whether the plaintiff would require future medical care. It is too late for the defendants to raise this issue for the first time on appeal.
The jury found that the plaintiff would require future medical care. The jury was *963 instructed to include an amount for future medical expenses, if warranted. Therefore, per force the jury must be presumed to have included an amount for future medicals in its lump sum award.
Accordingly, we must determine how much of the $165,000.00 consisted of an award of future medical expenses, and back that amount out of the lump sum award in order to determine whether that award is adequate.
Mrs. Taylor testified that at the time of trial plaintiff was taking medication costing approximately $200.00 per month. Dr. Morse testified that in a year he might taper her down on her antidepressants and then maintain her at a low level for a couple of years. By the time of trial, Dr. Morse was only seeing her when necessary. The most recent billing in the record from Dr. Morse is dated October 15, 1997, but the most recent item shown on that billing is a $300.00 comprehensive consultation charge dated April 18, 1997 which may have related more to preparation for this case than to necessary medical treatment. The next most recent charge is one dated June 6, 1996 for a nerve block and a "Daily Attending Physician - Outpatient," totaling $201.86. The next entry prior to that is a similar charge dated September 25, 1995. The increasing infrequency of these charges from September 25, 1995 on, do little to support a claim for future medical expenses. Other than Dr. Morse's billings, the plaintiff offered no medical bills for treatment from other sources dated after 1994. There is no other direct evidence of future medicals in the record.
Based on this very sparse and nebulous evidence, we have no reason to believe that the jury could or would have awarded any more than $5,000.00 for future medical expenses.

GENERAL DAMAGES
Plaintiffs assign as error the failure of the trial court to award general damages while awarding special damages. Doe v. Doe, 94-2284, 94-2285 (La.App. 1 Cir. 6/23/95); 657 So.2d 628, 632, writ den. 95-1810 (La.10/27/95); 661 So.2d 1353; Martin v. Francis, 600 So.2d 1382 (La.App. 1 Cir.1992), writ den. 606 So.2d 541 (La. 1992); Ammons v. St. Paul Fire and Marine Ins. Co., 525 So.2d 60 (La.App. 3 Cir.1988), writ den. 525 So.2d 1045 (La. 1988). The plaintiff argues that "the jury's verdict coincided precisely with the total of past special damages and allows no remaining monies for general damages or loss of future earning capacity." This argument is based on the assumption that the $165,000.00 jury award consisted of the $38,000.00 for medical expenses, the $127,000.00 balance being attributable, according to the plaintiffs, to Dr. Wolfson's testimony to the effect that the plaintiff lost $128,395.00 of wages through the date of the trial. According to the plaintiffs' argument, this leaves nothing for future lost wages/earning capacity (which Dr. Wolfson estimated at $168,795.00), and general damages (pain and suffering, etc.).
Pursuant of our review of the record, this Court was able to find evidentiary support for no more than $35,212.23 in past medical expenses. The balance of $129,787.77 is coincidentally close to the $128,395.00 estimated by Dr. Wolfson, but that is significantly different from plaintiffs' contention that it "coincides precisely" with Dr. Wolfson's estimate. Assuming that the jury accepted Dr. Wolfson's for lost wages, $129,787.77 is not a normal rounding of the figure, $128,395.00. There is a presumption of validity to the figure arrived at by the jury. The fact that the lost earnings figure testified to by Dr. Wolfson is within $1,392.77 of the balance left after $35,212.23 is deducted from the $165,000.00 amount awarded by the jury to include all general and special damages is not sufficient to overcome that presumption.
Moreover, the jury was not required to accept Dr. Wolfson's figure of $128,395.00 for past lost wages. The jury was entitled to find that Dr. Boudreaux's *964 estimate of $67,264.65 for past lost wages (adjusted from his estimate of $58,941.00 to account for the 15% error he acknowledged) was nearer the mark, but the jury could have also found that even Dr. Boudreaux's estimate was somewhat on the high side.
In Masters v. City of New Orleans, 94-2349, p. 5 (La.App. 4 Cir. 9/28/95); 662 So.2d 125, 127, this Court held that:
The City argues that the award for lost wages and loss of earning capacity should be reduced. Dr. Wolfson, forensic economist, used Masters' earnings of $19,920 in 1984, $18,389 in 1985, and $12,157 in 1986 to calculate lost wages of $155,564 up until the time of trial in June, 1994 and loss of wages in the future (for 8 years based on the anticipated average retirement age for a woman with Masters' date of birth) at a present value of $170,424 if Masters could not work or $107,235 if she could work at minimum wage. The trial court did not abuse its discretion by awarding $85,000. [Emphasis added.]
Thus in Masters this court held that it was not an abuse of discretion to award over $170,000 less than the minimum estimated by Dr. Wolfson's uncontroverted testimony.
Likewise, in Miller v. Dupont, 97-267 (La.App. 3 Cir. 10/8/97); 702 So.2d 902, writ den. 97-2837 & 97-2843 (La.1/30/98); 709 So.2d 713, 714, the court found that the trial court award of $100,000.00 for past and future lost wages was not an abuse of discretion, although it was considerably less than the total of the $44,542 in past lost earnings, plus $3,407 for the employer contribution to social security, and at least $71,252 of lost future income that should have been awarded according to the uncontradicted testimony of the only expert to testify.
Thus, it was not error for the jury to reject Dr. Wolfson's estimate of $168,795.00 for future lost wages/earning capacity as the jury implicitly did. It was within the discretion of the jury to prefer Dr. Boudreaux's estimate that the plaintiff was currently employed at earning capacity and could be expected to remain so with the result that the plaintiff had no loss of earning capacity. This does not mean that any time a plaintiff earns more after an accident than was earned before the accident that there can be no loss of earning capacity. It will depend on the evidence in each case.
Therefore, we cannot say that the jury failed to award general damages.
The plaintiffs contend that an award of any less than $300,000.00 in general damages represents an abuse of discretion by the jury. But plaintiffs cite no authority for this proposition.
A lump sum award of damages is normally presumed to award all items of damages claimed, and the burden of proving that the fact finder clearly abused its discretion in its damage award is more difficult than usual because the intention to award specific amount for any particular item may not be readily ascertainable, but each case must be determined on its own particular facts and circumstances. Burns v. United Gas Pipeline Co., 598 So.2d 397 (La.App. 4 Cir.), writ denied 605 So.2d 1147 (La.1992).
However, where it is possible to break out from the lump sum one or more specific items of damage, and to do so gives a better picture of the adequacy or inadequacy of the award, then it may be done. Hurt v. Viator, 537 So.2d 289 (La. App. 3 Cir.1988), writ den. 541 So.2d 857 (La.1989); Jones v. Sampey Bros. General Const., Ltd., 544 So.2d 1192 (La.App. 5 Cir. 1989); and Creppel v. American Tugs, Inc., 95-696 (La.App. 5 Cir. 1/17/96); 668 So.2d 374, writ den. 96-0643 (La.4/26/96); 672 So.2d 674.
In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. den. sub nom Maritime Overseas Corp. v. Hae Woo Youn, 508 U.S. 910, 113 S.Ct. 2342, *965 124 L.Ed.2d 252 (1993), the court explained that:
[T]he role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
In Reck, this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. [Citations omitted.] Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. [Citations omitted.]
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id., 623 So.2d 1257, 1261 (La.1993).
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience." Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th Cir.1991).
In this case we can fix past medical expenses at $35,212.23 and we can determine that the record will not support a finding of over $5,000.00 for future medical expenses. We also know that the jury could have awarded $67,000.00 or less for loss of past and future earnings. Backing these figures out of the lump sum award of $165,000.00 leaves approximately $58,000.00 at the very least for general damages.
Our task under Youn is to now determine whether this $58,000.00 (and perhaps more) figure for general damages is lower than a reasonable trier of fact could assess for the effects of Ms. Taylor's particular injury on her under the particular circumstances of this case.
Dr. Sumner, a medical expert for the defense, said that the problem was to determine whether the plaintiff had sustained damage to her sciatic nerve, a major nerve, or to her lateral femoral cutaneous nerve, a minor nerve. Dr. Sumner testified that he found no damage to the sciatic nerve which would have been serious because:
The sciatic nerve supplies all of the muscles strength to the back of your leg and to all of the muscles below the knee. It also supplies sensation to the back of the thigh and most of the area below the knee.
Dr. Sumner also testified that it is very easy to test for sciatic nerve damage. He noted no atrophy or loss of muscle strength in any muscle served by the sciatic *966 nerve and there was no loss of ankle reflex which Dr. Sumner indicated is the easiest way to diagnose even a very minor injury to the sciatic nerve. As a result of his examination Dr. Sumner determined that plaintiff had a lateral femoral cutaneous neuropathy, an injury to the thin nerve that serves the skin on the outside of the thigh. This can cause numbness and pain to the outside of the thigh. He also noted no clinical evidence of injury to the posterior femoral cutaneous nerve.
Dr. Sumner gave no opinion concerning future medical care.
Dr. Shamshia, another medical expert for the defense, testified that as a result of his clinical examination of the patient he found no sciatic nerve damage (no impairment of ankle reflexes), but did find indications of lateral femoral cutaneous neuropathy. However, he went on to testify that the EMG he directed Dr. Cruz to perform did not show any sign of damage to that nerve.
Dr. Shamshia gave no opinion concerning future medical care.
Dr. Kewalramani, a medical expert for the plaintiff, attributed the plaintiff's pain to the sciatic nerve, not the lateral femoral cutaneous nerve. He expressed no opinion as to the requirement for future medical attention.
Dr. Olson, the plaintiff's treating physician, was of the opinion that the plaintiff experienced sciatic nerve damage and posterior femoral cutaneous nerve damage and that her pain had become the focus of her life. He felt that such chronic pain effectively prevented her from working until she became able to manage the pain. Dr. Olson testified that the plaintiff had fatigue, lethargy and depression related to her chronic pain, but somewhat aggravated by the medication required for her pain. Dr. Olson expressed no opinion concerning future medical care.
The jury concluded that the plaintiff sustained sciatic nerve damage as a result of her injury. We cannot say that the jury was manifestly erroneous in deciding that Ms. Taylor had suffered sciatic nerve damage. It was within the prerogative of the jury to prefer the testimony of Dr. Olson and Dr. Kewalramani to that effect instead of the contrary testimony of Dr. Sumner and Dr. Shamshia. Miller v. Miller, 602 So.2d 330 (La.App. 4 Cir.1992). This is especially true in view of the fact that Dr. Olson was one of the plaintiff's treating physicians for a number of years and Drs. Sumner and Shamshia were not.
Dr. Walter Sanders, Jr., testified that the plaintiff was angry, depressed and anxious as a result of being worn down by constant pain, but he expressed no opinion concerning future medical care.
Dr. Roger Anastasio, a psychiatrist, testified that the plaintiff reported symptoms of anxiety, sleeplessness, and suicidal feelings.
Dr. Richard Morse, a psychiatrist, testified that plaintiff suffered from major depression.
Plaintiff suffered pain for years and will likely suffer pain for years to come. However, she has learned to live with the pain. On the one hand there is testimony concerning how much the pain depressed her and impacted her daily activities and ability to work. Looked at from this perspective only, the general damage award seems perhaps so low as to be unreasonable. On the other hand the jury heard the plaintiff's testimony that she has continued to bowl several times a week and is now employed earning more than she was earning at the time of her injury. Moreover, the plaintiff underwent no operations. The jury could have reasonably felt that these unsympathetic factors were significant. The fact that this Court might take a more sympathetic view to the plaintiff's sufferings than the jury did is not the standard by which we are required to review the jury award. Thus, we can find no abuse of the great discretion afforded to the jury in making such awards, especially when we are handicapped *967 at the outset by the lump sum award which is susceptible of only approximate dissection. However, as we find the award to be at the very low end of the acceptable scale (perhaps being influenced by a more sympathetic view of plaintiff's the evidence than was the jury) we find that a review of similar awards reconciles us better to this result, in spite of the fact that Youn says that such a review of prior awards is not called for in the absence of a finding of abuse of discretion.
In Johnson v. State, 95-0003 (La.App. 1 Cir. 10/6/95); 671 So.2d 454, writ den. 95-2666 (La.1/5/96); 667 So.2d 522, the appellate court awarded $85,000.00 to the plaintiff who had herniated discs at C5-6 and C6-7, and aggravation of degenerative arthritis in the lower lumbar spine. She had to undergo an anterior diskectomy and inner body fusion. She suffered an infection in the donor site of a bone graft which required antibiotics and drainage. She was no longer able to perform her customary work. She was no longer able to enjoy recreational activities such as bowling and fishing. Furthermore, her doctor opined that she will have neck stiffness and may suffer sporadic pain for the rest of her life.
In Khaled v. Windham, 94-2171 (La. App. 1 Cir. 6/23/95); 657 So.2d 672, writ dismissed 95-1914 (La.11/1/95); 661 So.2d 1369, the court of appeal awarded the plaintiff $75,000.00 for two disc injuries sustained in an auto accident resulting in a permanent disability rating of 20% of the lumbar spine and 10% of the body as a whole. The plaintiff also suffered from numerous abrasions and lacerations, some of which required sutures. Numerous glass fragments became imbedded in plaintiff's back and continued to rise to the surface of the skin for some time after the accident. His back is permanently scarred, causing discomfort, itching and embarrassment. He continues to suffer pain in his lower back and left leg, which sometimes becomes so bad that he must wear a back brace. He can no longer participate in sports. He sustained headaches as a result of post-myelogram syndrome so severe that he was bedridden for a week and a half.
In Rudd v. Atlas Processing Refinery, 26,048 (La.App. 2 Cir. 9/21/94); 644 So.2d 402, writ den. 94-2605 (La.12/16/94); 648 So.2d 392, the court of appeal found that an award of $100,000.00 was not excessive for a plaintiff who sustained a back injury resulting in lower back pain radiating into both legs, numbness, sexual dysfunction and weakness. Plaintiff had to undergo lumbar laminectomies. The plaintiff could not sit for more than two hours, nor would be ever be able to lift more than 25 pounds. The plaintiff will have to endure pain, suffering, inconvenience and restrictions for the rest of his life. The Rudd court did not state or imply that the award was minimal or low.
In Faul v. State, DOTD, 94-502 (La. App. 3 Cir. 11/2/94); 649 So.2d 493, the appellate court found that a general damage award of $50,000.00 was not excessive for an injury resulting in inoperable chronic back pain that would require treatment with medication and activity restrictions.
In Iorio v. Grossie, 94-846 (La.App. 3 Cir. 10/4/95); 663 So.2d 366, the appellate court awarded $45,000.00 for general damages to a plaintiff who had been injured in an automobile accident. She had significant knee pain for several months. Her carpal tunnel syndrome and subsequent corrective surgery caused her great pain. The wrist is now weaker and fatigues more easily. The injuries prevented plaintiff from picking up or dressing her two small children, as well as cooking or performing other housework. She continues to experience increasingly severe neck pain, especially when she engages in bending, lifting, or other physical exertion. As a result she is unable to participate in many of the activities that she enjoyed prior to the accident, such as gardening and playing with her children. Additionally, the typing and bending activity entailed by her work as a secretary renders the residual effects of the injuries very noticeable on a daily *968 basis. She has a permanent 5 - 10% disability in her neck and will continue to suffer from neck pain. She was only 30 years old at the time of the accident. Her physical activities have been curtailed abruptly by pain and fear of aggravating her injuries.
In Gaines v. Daiichi Chuo Shipping (American), Inc., 95-1597 (La.App. 4 Cir. 4/24/96); 673 So.2d 1192, this Court awarded $52,000.00 in general damages to a plaintiff who injured his back falling on a ship's deck. Plaintiff was able to return to work full-time after one year, but could no longer do the type of heavy manual labor he had done for the previous twenty-five years. He complains continuously of back pains. A neurosurgeon testified that the plaintiff had intractable lumbosacral back pain and recommended conservative treatment. He could no longer fish or hunt and cannot sit for extended periods. He has headaches.
The amount awarded in this case is not obviously the result of passion or prejudice, and it bears a reasonable relationship to the elements of the proved damages. Youn, supra. Many rational triers of fact could have decided that a higher award is more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed the awards of general damages at the level set by the jury or that this is one of those exceptional cases where such awards are so gross as to be contrary to right reason. Id.
To the imperfect extent to which we are able to dissect the jury's lump sum award, we are unable to say that the general damage component of that award represents an abuse of the jury's great and vast discretion. The award is not so low as to shock the conscience or offend right reason.

LOSS OF CONSORTIUM
The defendant contends that the $35,000.00 loss of consortium award to the plaintiff's husband was grossly excessive. This award was supported by extensive testimony from the plaintiff, her husband, and various family members describing her substantially diminished interest and ability to participate in conjugal and family activities and household chores. Although this award is on the high side for such awards, we cannot say that the jury abused its great and vast discretion in making such a general damage award. See: Vicknair v. Dimitryadis, 93-0003 (La.App. 4 Cir. 1/13/94); 640 So.2d 275; Whiddon v. Hutchinson, 94-2000 (La.App. 1 Cir. 2/23/96); 668 So.2d 1368, writ den. 96-0731 & 96-0775 (La.5/10/96); 672 So.2d 923.

DECREE
For the foregoing reasons the judgment of the lower court is clarified to indicate that the defendants are entitled to credit for $25,000.00 against the $165,000.00 awarded to Ms. Cynthia Taylor, resulting in a net award to Ms. Taylor of $135,000.00, and as clarified, the judgment of the trial court is affirmed.
JUDGMENT CLARIFIED AND AFFIRMED.

ON REHEARING GRANTED
This Court grants rehearing in order to consider the issue raised in the application for rehearing of the defendants, the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Oversight Board, appearing through and nominal defendant, the administrators of the Tulane Educational Fund d/b/a Tulane Medical Center ("PCF") that the original decision of this Court rendered on November 24, 1999 failed to award credit for $100,000.
Where footnote 5 of this Court's original opinion states that the trial court "recognized the PCF's right to a $25,000 credit" *969 that wording should have been followed by the phrase, "in addition to the $75,000 actually paid, for a total credit of $100,000." This Court notes that the plaintiffs were given the opportunity to dispute this enterpretation but did not do so.
Accordingly, the decree originally rendered by this Court is amended to increase the amount of credit awarded the defendants from $25,000 to $100,000. In all other respects the original opinion of this Court is affirmed.
The Court notes that the plaintiff's application for rehearing was reviewed by this Court, but finds that it raises no issues that would cause this Court to change its position.
ORIGINAL OPINION AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] Where this opinion refers to the "plaintiff" in the singular it is a reference to Cynthia Taylor.
[2] There were several individual defendants who were dismissed from this litigation early on and who do not figure in this appeal. This appeal represents the consolidation of three cases, but the consolidation is not an issue in this appeal.
[3] Where this opinion refers to the "plaintiffs" in the plural it is a reference to Cynthia Taylor and her husband, Robert Taylor, Jr.
[4] The defendants-appellees have technically styled themselves the "Louisiana Patient's Compensation Fund" and the "Louisiana Patient's Fund Compensation Fund Oversight Board", appearing through and nominal defendant, the Administrator's of the Tulane Educational Fund d/b/a Tulane Medical Center. Therefore, this is the party to whom we refer throughout this opinion wherever we refer to the defendant or the appellee, whether in the singular or the plural.
[5] We interpret this as the trial court's way of saying it had granted a new trial on its own motion pursuant to LSA-C.C.P. art.1971 and in so doing recognized the PCF's right to a $25,000.00 credit. This has not been contested by the plaintiffs on this appeal.
[6] Although we feel that the imprecise nature of the earnings capacity calculation calls for a wide latitude favoring the admissibility of evidence, we do not mean to suggest that scope of admissibility is limitless. For example, there would obviously be valid objections as to the relevance of evidence of income derived from a childhood lemonade stand when considering the earnings capacity of a forty year old nurse.
[7] As will be seen when the jury is polled, it is significant that these instructions use the term "medical expenses" and not "medical damages."
[8] Note that at this juncture the trial court switches from the term "medical expenses" as used in the jury instructions, to the synonymous term "medical damages." The significance of this change in terminology will quickly manifest itself as the jury is polled.
[9] It is at this point that it becomes apparent that the jurors were carefully tuned in to the instructions which employed the term "medical expenses." Therefore, it is reasonable to assume that the jury was equally tuned in to the instruction directing them to make an award for future as well as for past medical expenses.
[10] Here again is evidence that the jury was acutely aware of the precise wording of the trial court's instructions. It is impressive testimony in support of the competency of jurors to be attentive to their duties.
[11] We note that in Owens, supra, cited by the plaintiffs, the attorney for Concordia consistently objected to the polling, before, during and after.
[12] This Court spent considerable time painstakingly analyzing Dr. Morse's bill, the difficulty being that the credits and debits appear in the same column on all but the 1996 portion of the billing, so the debits must be extracted individually and added.
[13] There is only one bill in the record for ½ of this amount, but the plaintiff testified without objection or rebuttal that there was another, no longer in her possession, in the same amount.
[14] The plaintiff testified to this amount without objection and without rebuttal.