PAUL A. BONIN, Judge.
 

 1jWhile a patient at the Medical Center of Louisiana at New Orleans (MCLNO), Tyrone Flemings was injured by the fault of his nurses, whose liability was stipulated. Following a trial by jury, the court entered a judgment in favor of Mr. Flem-ings for $530,000.00. MCLNO has filed a suspensive appeal from the judgment and Mr. Flemings has timely answered the appeal, seeking damages for a frivolous appeal. For the reasons which follow, we affirm the trial court’s judgment and deny damages for frivolous appeal.
 

 I
 

 Mr. Flemings instituted medical review panel proceedings against MCLNO pursuant to La. R.S. 40:1299.39, the Malpractice Liability for State Services Act (MLSSA), which governs medical malpractice claims against the state and its employees. The panel ruled in favor of the healthcare providers, following which ruling Mr. Flem-ings filed this suit. Before the commencement of trial, MCLNO stipulated to liability, leaving only the issues of causation and damages for trial before the jury.
 

 IgAfter four days of trial, the jury returned a verdict assessing damages totaling $855,000, including $30,000 in past medical expenses.
 
 [1]
 
 Based upon the jury’s verdict but applying the provisions of La. R.S. 40:1299.39(F), the trial court rendered judgment against MCLNO in the amount of $500,000, plus $30,000 for the past medical expenses, with interest and costs.
 

 II
 

 On November 13, 1999 Mr. Flemings was the victim of an armed robbery. During the robbery the perpetrators shot him in the back, stomach, and left arm. He was transported to MCLNO, where he underwent lifesaving surgery. While in the hospital’s Surgical Intensive Care Unit recuperating from the surgery and gunshot wounds, the course of his therapy included the insertion and use of an IV catheter in his right hand. Although the nurses observed signs that Mr. Flemings’ right hand was cold and hard, and was swelling, and his nails were blackening, no one took any steps to remove the IV and stop the leakage of damaging solutions into Mr. Flemings’ tissues. Mr. Flemings, intubated and heavily sedated, was unable to communicate the pain which was being caused by the extravasation injury. Before he was discharged from the hospital, it was noted that he was unable to move his right arm.
 

 By January 4, 2000, Mr. Flemings sought treatment for his right hand injury
 
 *1224
 
 with Dr. John Lindsey, a hand and plastic reconstructive surgeon. Dr. Lindsey observed a raw wound, with no skin, covering about half of the right hand. The |athumb and index finger had contracted in the web space such that Mr. Flemings could not extend his thumb away from his index finger. Dr. Lindsey concluded that the IV fluids had intruded into the small muscles of the right hand and had caused internal damage. The resulting damage was restricting the function of the hand and Dr. Lindsey recommended physical therapy to loosen the contracture.
 

 Mr. Flemings attempted physical therapy, but returned to Dr. Lindsey on March 10, 2000, showing not only no improvement, but rather a deterioration of the medical situation. The contracture in the web space persisted and the joint at the base of the thumb appeared frozen. Dr. Lindsey advised that surgery on the hand would probably be necessary. Eventually, after performing nerve conduction studies and measuring the differential between Mr. Flemings’ thumb movement and normal thumb movement, and finding that Mr. Flemings was losing feeling in his thumb and fingers on his right hand, Dr. Lindsey recommended a surgery known as z-plasty. Mr. Flemings’ thumb could not move away from the index finger more than 10 degrees, whereas the normal range is 80-90 degrees. The hand deficit was 45-50 percent of total function, and the thumb deficit was 90 percent. Dr. Lindsey performed this surgery on July 6, 2000, in the hope of releasing ligaments, muscles, and skin.
 

 While performing the hand surgery on July 6, 2000, Dr. Lindsey was able to observe scarring and permanent nerve damage to the musculature of the right thumb. By drilling k-wire through the index finger and the thumb, Dr. Lindsey was able to extend the thumb out to 45 degrees. However, instead of allowing the [4wire to remain for the planned four to six weeks, Dr. Lindsey had to surgically remove the wire on July 26, 2000, because Mr. Flemings’ hand had become swollen and infected, preventing physical therapy.
 

 Continuing to follow Mr. Flemings, Dr. Lindsey observed keloid scarring. By October 10, 2000, the right thumb was again frozen, attributable to the loss of elasticity and loss of skin on the back of the hand due to the injury.
 

 Dr. Lindsey proposed another surgery, a two-part procedure, to Mr. Flemings. This surgery would involve a skin graft, resulting in deformity of the hand, and removal of the entire thumb joint, followed by reconstruction of the tendon transfer. Dr. Lindsey as part of this surgery would perform a groin flap, which would require sewing Mr. Flemings’ hand inside his groin. This would allow the blood flow to support the graft. The hand would remain pocketed for a little over a week.
 

 This surgery presented a substantial risk of irrevocable disfigurement as well as risk of infection. Dr. Lindsey further opined that a carpal tunnel release would be performed to address the continued complaints of numbness. Mr. Flemings was fearful of this surgery, since Dr. Lindsey stated that this surgery was “not a wonderful cure-all” with a potential for failure.
 

 Following Mr. Flemings as his patient, in March 2001 Dr. Lindsey noted severe limitations in the range of motion with no change from the previous visit. A year later, in March 2002, Mr. Flemings presented with contracture of the first web space, back down to ten degrees, and inability to function. The basal joint was | ¡/‘frozen” and soft tissue appeared to be restricted, due to infection with the hardware, the surgery itself, and lack of use, all of which exacerbated the scarring. At
 
 *1225
 
 the March 2002 visit, Dr. Lindsey again discussed with Mr. Flemings the prospects for surgery, this one involving growth of web skin with a groin flap. Mr. Flemings, who has limited education and intellectual ability to comprehend the sophisticated medical suggestions, was fearful of the surgery, after the doctors who had already treated him had been unable to effect a return of his hand function. He did not undergo Dr. Lindsey’s suggested procedure. Mr. Flemings’ limited finances prohibited his attending formal physical therapy which might have decreased the buildup of scar tissue. Moreover, Mr. Flemings had ongoing infection from his abdominal wounds, posing additional surgical risks.
 

 Dr. Lindsey last saw Mr. Flemings in August 2004, at which time he found grip strength to be “surprisingly good,” but the right hand had lifelong scarring and disfigurement and impairment. Although he discharged Mr. Flemings to return to work, the doctor acknowledged that the functional deficits would make working very difficult.
 

 Referred by Dr. Lindsey to another hand specialist, Dr. Eric George, Mr. Flemings obtained a second, different surgery recommendation. In July 2005, Dr. George suggested opening the web space with a bone and joint release and a full thickness graft. Dr. George documented limited range of motion of the TMC joint, no extension across the level of the thumb, significant web space contracture which opened less than 15 degrees, large dorsal skin changes, deformity of the PIP joint Lof Mr. Flemings’ long finger, in sum, a dramatically reduced-functioning hand. He noted numbness in fingertips, scarring on the inside of the palm, a large scar over the volar base of the thumb and post-surgical changes along the index, thumb, and interspace including the base of the thumb.
 

 Dr. George recommended a surgery to Mr. Flemings which would include a procedure to reattach the tendon to the long finger, tenolysis for the index finger, and opening of the web space, which may require the groin flap as described by Dr. Lindsey, or may be accomplished by a full thickness graft. That would entail removing skin from Mr. Flemings’ leg and putting it into the defect, cutting tissues and rearranging them to give more extension of the thumb. Dr. George recommended nerve conduction study and Functional Capacity Evaluation. These studies, performed by Dr. Daniel Trahant, showed that Mr. Flemings had a 35 percent impairment of the upper extremity or a 21 percent permanent impairment of the total man.
 

 A third physician, Dr. Donald Faust, examined Mr. Flemings on June 6, 2006, at the request of the defendant and offered yet another procedure in the array of suggested surgeries that might help him. After reviewing the preceding doctors’ recommendations and the medical records, Dr. Faust testified that other than patients who lose their entire hand, Mr. Flemings’ extravasation injury was the most severe that he had ever seen. Dr. Faust acknowledged that the previous debridement process to remove necrotic tissue was a very painful event. Dr. Faust disagreed with Dr. Lindsey’s recommendation of a second soft-tissue surgery due |7to the scar tissue already present. Moreover, he recognized that living with one’s hand sewn into his groin for a month and ending with a not very “cosmetic” hand would be an “ordeal.” He noted, “[t]he only problem with the index finger was the thumb was in the way, so he couldn’t bend it down because of the thumb,” although the rest of the hand “showed full motion.” He recom
 
 *1226
 
 mended a less costly surgical procedure, an osteotomy of the thumb metacarpal, which would involve breaking the bone in the thumb and resetting it in a more functional position. Dr. Faust testified that even with surgery, nothing could correct the scarring and deformity on Mr. Flem-ings’ right hand, or the permanent loss of function and impairment, or return him to work as a full-time mechanic. Dr. Faust, who found some of Mr. Flemings’ complaints of pain to be inconsistent with objective findings, gave him a 34 percent impairment rating to the right upper extremity.
 

 Dr. Cornelius Gorman, an expert in vocational rehabilitation, tested Mr. Flem-ings and found him capable of reading at a sixth-grade level, with a cooperative attitude and desire to return to the work he formerly performed. However, academic tests showed Mr. Flemings to be academically illiterate, with academic retardation; accordingly, Dr. Gorman testified that Mr. Flemings was temporarily/totally disabled from the date of the accident, not being able to sustain any full-time activity due to his disability. Mr. Flemings testified that he completed only the tenth grade in New Orleans; he had to quit school to help support his family of six siblings, and learned the auto mechanic trade in his neighborhood, and chiefly worked rebuilding engines, doing brake jobs and tunejups8 for the Orleans Parish Sheriffs fleet of vehicles. Dr. Gorman opined that Mr. Flemings could return to the workforce for 25 hours per week, but not doing any activity for a long period of time, and he would never meet the criteria for a full-time auto mechanic.
 

 Dr. Edward Shwery, a clinical psychologist specializing in the treatment of chronic pain, testified that the inherent strong work ethic of Mr. Flemings made his disability and failures in the job market affect him markedly. The hand injury caused his psychological problems, including chronic pain and depression centering around his inability to work as a mechanic as he had done in the past. The functional capacity evaluation performed in March 2006 suggested that Mr. Flemings could return to light to medium level work activity. Much depended upon whether Mr. Flemings would undergo the recommended surgery and have a successful outcome. The hand injury and its sequellae are complicated by the pain and anxiety and depression caused by the injuries from the gunshots.
 

 Dr. Kenneth Boudreaux, an economist, testified regarding Mr. Flemings’ lost wages and loss of earning capacity. Using the figures given him by Dr. Gorman ($10 to $17.20 per hour), he relied on data provided by Dr. Gorman regarding pre-injury wages and future reduced earning capacity. Dr. Boudreaux testified that future lost wages could be as high as $220,-000
 
 [2]
 
 based on work records and tax returns for seven years preceding the injury. He recognized the 19permanent 35 percent impairment of the upper extremity which equates to 21 percent impairment of the person.
 

 Ill
 

 MCLNO submitted the following as one of its assignments of error: “Did the trial court err in finding plaintiff to be credible?” MCLNO suggests that Mr. Flemings was directly impeached at least three times during the trial with prior inconsistent testimony given by him in his discovery deposition.
 
 See generally
 
 La. C.E. art. 607(D)(2). In each
 
 instance
 
 he had testified to some fact which appeared more favorable to him than what was the
 
 *1227
 
 truth to which he admitted at trial. He admitted at trial that he was not employed at the time of his injury, that he had been disciplined and even suspended on numerous occasions by his pre-injury employer, and that he had not always been drug-free since 1990.
 

 The jury, as the trier of fact, heard Mr. Flemings’ explanations for the differences between his deposition testimony and his trial testimony. The trial judge did not exclude this evidence.
 
 See
 
 La. C.E. art. 104. The Louisiana Supreme Court some time ago in
 
 Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989) instructed intermediate appellate courts on evaluating the credibility of any witness:
 

 When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.... Where documents or objective evidence so contradict the witness’s story, or the story itself is so implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination ....
 
 But |10where such factors are not present, and a factfinders ’s finding is based on its decision to credit the testimony of one or tivo or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong
 
 ....
 

 Rosell, supra
 
 (emphasis supplied; ellipses indicate citations omitted). We continue to follow the instruction of the Supreme Court.
 
 Neal Auction Company, Inc. v. Lafayette Insurance Company,
 
 08-0574 (La.App. 4 Cir. 4/29/09), 13 So.3d 1135;
 
 Logan v. Brink’s, Inc.,
 
 09-0001 (La.App. 4 Cir. 7/1/09), 16 So.3d 530.
 

 Mr. Flemings explained to the jury that he misunderstood one question asked in his deposition, did not understand a question about “discipline”, and that he did not understand the term “clean” to be referring to drugs; he testified that he would have truthfully answered a simple question about whether he smoked marijuana. The factfinder also heard from an expert witness that Mr. Flemings was academically illiterate and that on his IQ test revealed borderline functioning, or academic retardation.
 

 Apparently, MCLNO accepts the truthfulness of Mr. Flemings’
 
 trial
 
 testimony that he was unemployed at the time of his injury, that he had been suspended several times by his pre-injury employer, and that he had used marijuana prior to his injury. Though MCLNO does not specify which fact or facts found by the jury which MCLNO supposes found Mr. Flemings credible, we have considered the decisions of the jury on the two items of special damages which are most implicated by Mr. Flemings’ cited testimony. Dr. Bou-dreaux, a forensic economist, estimated Mr. Flemings’ past lost wages up to $150,000 and his future lost wages or reduced earning capacity up to $220,000. There was no countervailing economic evidence introduced by MCLNO. Yet the jury awarded In past lost wages of $75,000 and future loss of earning capacity of $90,000. These awards suggest that the jury did find Mr. Flemings’ trial testimony credible and that Mr. Flemings did not possess a stellar employment history.
 

 We discern no manifest error in the jury concluding, based upon the truthfulness of Mr. Flemings’ trial testimony viewed along with his prior inconsistent statements, that Mr. Flemings’ work history justified some
 
 *1228
 
 economic losses but not necessarily those which an exemplary worker in similar circumstances would likely have sustained. Consequently, we find that this assignment of error is without merit.
 

 IV
 

 The remaining three errors assigned by MCLNO concern the excessiveness of the award of general damages.
 
 [3]
 
 The jury found that Mr. Flemings sustained general damages in the amount of $660,000. Included in this total amount, the jury had itemized $200,000 for permanent scarring and $200,000 for permanent disability. Permanent scarring is an item of general damages,
 
 Jemison v. Kennelly,
 
 333 So.2d 367, 368 (La.App. 4th Cir.1976), as is permanent disability,
 
 Merrill v. Jones,
 
 552 So.2d 466, 468 (La.App. 4th Cir.1989).
 

 MCLNO argues that the overall general damages award is excessive because Mr. Flemings failed to mitigate his damages. It further argues that the itemized awards of $200,000 for permanent scarring and of $150,000 for permanent disability are excessive.
 

 112^
 

 We are, as we explain below, constrained in our review of the contention of MCLNO that Mr. Flemings failed to mitigate. The obligation of a party at fault is generally limited to repair of only the damage
 
 caused
 
 by his act. La. C.C. arts. 2315 and 2324(B).
 
 [4]
 
 A party injured by the fault of another is, of course, obliged to take reasonable steps to mitigate damages.
 
 Jacobs as Tutor of Jacobs v. New Orleans Public Service, Inc.,
 
 432 So.2d 843, 846 (La.1983). The basis for this obligation is “the doctrine of avoidable consequences.” Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law (Second) § 7.06 (2008);
 
 Unverzagt v. Young Builders, Inc.,
 
 252 La. 1091, 1097, 215 So.2d 823, 825 (La.1968). The
 
 Unverzagt
 
 court squarely placed the doctrine of mitigation of damages or of avoidable consequences in former La. C.C. art. 2323 (1870), which, prior to its 1979 repeal, stated:
 

 The damage caused is not always estimated at the exact value of the thing destroyed or injured; it may be reduced according to circumstances, if the owner of the thing has exposed it imprudently.
 

 Professor Malone had argued that this article was the unrecognized source of the doctrine of comparative fault in Louisiana’s civilian tradition.
 
 See
 
 Malone, “Comparative negligence — Louisiana’s forgotten heritage.” 6 La. L.Rev. 125 (1945). Also relying upon former La. C.C. art. 2323 (1870), in
 
 Riley v. Frantz,
 
 253 So.2d 237, 245 (La.App. 4th Cir.1971), our court stated:
 

 [T]he law is quite clear that the injured party is required to minimize his damages. The doctrine of mitigation of damages imposes on the injured person a duty to exercise reasonable diligence and ordinary care in attempting to minimize his damages after the injury has been inflicted. The care and diligence
 
 *1229
 
 required of him is the same as that 11swhich would be used by a man of ordinary prudence under like circumstances. He need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages, although his efforts must be reasonable and according to the rules of common sense, good faith, and fair dealing.
 

 The first circuit in
 
 Reeves v. Louisiana and Arkansas Railway Co.,
 
 304 So.2d 370, 375 (La.App. 1st Cir.1974) (ellipses indicate omitted citations):
 

 An injured party is obligated to submit to reasonable medical treatment recommended for his improvement in order to minimize his damages....
 

 A plaintiff who unreasonable [sic] refuses recommended medical treatment is not entitled to recover for any aggravation of his initial condition resulting from his unreasonable failure to submit to medical treatment recommended by competent medical authority....
 

 The failure of an injured victim to exercise the care and diligence which would be used by a man of ordinary prudence under like circumstances to submit to reasonable medical treatment recommended for his improvement by competent medical authority constitutes victim fault.
 
 See
 
 La. C.C. art. 2323.
 

 We recognize that MCLNO properly pleaded the failure to mitigate as an affirmative defense. La. C.C.P. art. 1005. MCLNO bore the burden of proving by a preponderance of evidence this affirmative defense.
 
 Taylor v. Tulane Medical Center,
 
 98-1968, 98-1969, 98-1967, pp. 5-6 (La.App. 4 Cir. 11/24/99), 751 So.2d 949, 954. MCLNO adduced evidence at the trial that arguably supported its defense and, we are informed, the trial judge properly instructed the jury on the affirmative defense.
 
 Compare Id.,
 
 pp. 5-6, 751 So.2d at 954-55. However, the issue was not properly preserved for appellate review. MCLNO did not request that the jury verdict form specifically require the jury to answer a special interrogatory whether Mr. Flemings failed to mitigate his damages. La. C.C.P. art. |U1813(A). Also, there was no request from MCLNO that the court submit to the jury special written questions inquiring as to victim fault created by Mr. Flemings’ alleged failure to mitigate. La. C.C.P. art. 1812(C)(3).
 
 [5]
 

 The use by the trial courts of special verdict forms are especially valuable for a reviewing court.
 
 Guillory v. Avondale Shipyards, Inc.,
 
 448 So.2d 1281, 1286 (La.1984);
 
 Campbell v. Chatelain,
 
 286 So.2d 799, 801 n. 3 (La.App. 4th Cir.1974). In the absence of a specific answer to an interrogatory, we apply La. C.C.P. art. 1812(A), which provides in pertinent part:
 

 ... If the court omits any issue of fact raised by the pleadings or the evidence, each party waives his right to a trial by jury of the issue omitted, unless, before the jury retires, he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding, or
 
 if it fails to do so, it shall be presumed to have made a finding in accord with the judgment on the special verdict,
 
 (emphasis supplied)
 

 MCLNO is precluded in complaining on appeal about whether the jury was manifestly erroneous in
 
 not
 
 finding that Mr. Flemings failed to mitigate his damages when it failed to object to the absence of a special jury finding on this issue raised by
 
 *1230
 
 its pleadings and the evidence.
 
 See Clark v. Jesuit High School of New Orleans,
 
 96-1307, pp. 4-5 (La.App. 4 Cir. 12/27/96), 686 So.2d 998, 1001. The acquiescence of MCLNO in the jury verdict form effectively prevents the reviewing court from knowing whether or not the jury reduced its damages assessment on account of the alleged failure of Mr. Flemings to mitigate.
 
 See Wilson v. Transportation Consultants, Inc.,
 
 04-0334, 04-0335, p. 9 (La.App. 4 Cir. 3/2/05), 899 So.2d 590, 598-99. We cannot engage in speculation or conjecture about a properly instructed jury’s finding on this important issue when MCLNO neglected to properly preserve the issue for review.
 
 See Courtney v. Williams,
 
 01-0717, pp. 7-8 (La.App. 4 Cir. 8/21/02), 826 So.2d 594, 598.
 
 [6]
 

 Our review of the entire record shows that the jury was aware that Mr. Flemings had only attended school until the tenth grade. He was informally trained as an auto mechanic and pursued that occupation most of his adult life. Educational testing revealed borderline intelligence and academic illiteracy. His physical condition was weakened due to the sequellae of the gunshot wounds along with some mental depression. In the jury’s consideration and determination of Mr. Flemings’ reasonableness in refusing farther surgeries, the jury surely considered that Mr. Flem-ings was a victim of medical negligence. Moreover, his first hand surgery resulted in an unexpected serious infection, necessitating a second surgery for the removal of wires from his hand.
 

 Notwithstanding his limited understanding and his medical misfortunes, Mr. Flemings, MCLNO suggests, was unreasonable in not undergoing a third surgery despite the fact that the three different hand surgeons recommended three
 
 different
 
 surgeries to Mr. Flemings. The three hand surgeons expressed to Mr. Flemings considerably different opinions about which surgery would have the best outcome for him. Because of his high propensity to infection on account of the bullet wounds, none of the surgeons could discount the risk of infection, failure, and scarring. If the jury concluded, as MCLNO speculates, that Mr. Flemings was not unreasonable in refusing a third hand surgery, such a finding could not be manifestly erroneous.
 
 See Merrell v. State Dept. of Transportation and Development,
 
 415 So.2d 660, 668 (La.App. 3d Cir.1982) (holding that because the plaintiff refused to undergo surgery which would not alleviate his disability from his injuries in a vehicular accident, the failure-to-mitigate defense was without merit);
 
 Jacobs, supra,
 
 432 So.2d at 846 (holding that the plaintiffs “recovery will not be limited because of a refusal to undergo medical treatment that holds little promise for successful recovery.... The expense and inconvenience of treatment are also proper considerations in determining the reasonableness of a person’s refusal to submit to treatment.”) (citations omitted).
 
 See
 
 Russ M. Herman, Louisiana Practice Series, Vol. 1, Personal Injury, § 5.199 (2008);
 
 Porter v. State Through Dept. of Public Safety and Corrections,
 
 97-555 (La.App. 5 Cir. 10/28/97), 701 So.2d 1069,
 
 writ denied,
 
 709 So.2d 736 (La.1998);
 
 *1231
 

 Normand, v. Hartford Fire Ins. Co.,
 
 538 So.2d 682, 634-35 (La.App. 5th Cir.1988).
 

 MCLNO also contended that Mr. Flem-ings refused to participate in physical therapy. Mr. Flemings testified that the therapy sessions were very painful because of his infection; his physician agreed that he could not attend physical therapy while his hand was infected.
 
 See Reeves, supra,
 
 304 So.2d at 376;
 
 Schexnayder v. United Services Automobile Association,
 
 375 So.2d 736, 739 (La.App. 4th Cir.1979) (affirming the trial court’s refusal to reduce a damage award for plaintiffs alleged failure to mitigate when he stopped physical therapy exercises “primarily because of pain.”);
 
 Porter,
 
 97-555, p. 8 (La.App. 5 Cir. 10/28/97), 701 So.2d 1069, 1072 (rejecting defendant’s mitigation argument because plaintiff attempted physical therapy but found it was too painful to continue, and there was no |17evidence to show that she would have improved had she followed the physical therapy recommendation, or worsened had she discontinued it.).
 

 Mr. Flemings also testified that he did not have sufficient funds to continue physical therapy. The expense and inconvenience of treatment are proper factors underlying a person’s refusal or termination of therapy or treatment.
 
 See Kuck v. City of New Orleans,
 
 531 So.2d 1142, 1144 (La.App. 4th Cir. 1988);
 
 Andrus v. Security Ins. Co. of New Haven,
 
 161 So.2d 113, 115-16 (La.App. 3d Cir.3/22/1964).
 
 [7]
 

 Therefore, an injury victim does not fail to mitigate his damages when he refuses to undergo surgery which would not significantly alleviate his disability or which carries risks of failure, more scarring and pain, or when the treatment is painful, or when he is unable to pay for the treatment. In sum, if the jury concluded that Mr. Flemings was not unreasonable in not further attending physical therapy sessions or in rejecting additional surgery, especially in light of his medical history of multiple gunshot wounds injuries, infection, keloid and scarring and pain, such a finding on this record could not be manifestly erroneous.
 

 This assignment of error is without merit.
 

 B
 

 MCLNO seeks review of the ex-cessiveness of the jury’s
 
 findings
 
 on the discrete items of general damages pertaining to permanent scarring and permanent disability. Before we undertake that review, we are first guided by the principle announced in
 
 Hall v. Brookshire Brothers, Ltd.,
 
 02-2404, 02-2421 (La.6/27/03), 848 So.2d 559. In
 
 Hall
 
 the jury found that a victim of medical malpractice sustained damages far in excess of the statutory cap authorized by La. R.S. 40:1299.42(B)(1).
 
 [8]
 
 The jury also found and quantified victim and third party fault. The issue of first impression for our Supreme Court was “the proper method for calculating the percentage reduction for comparative fault
 
 *1232
 
 when the award of damages in a malpractice action exceeds the statutory cap.”
 
 Id,.,
 
 p. 14, 848 So.2d at 568.
 

 The Supreme Court distinguished between a jury’s assessment of the damages recoverable and the amount to be paid to a victim of medical malpractice.
 
 Id.,
 
 p. 18-19, 848 So.2d at 571. The
 
 Hall
 
 decision determined that
 

 ... when a verdict is reduced by comparative fault before the cap of LSA-R.S. 40:1299.42(B)(1) is applied, there is no risk that the plaintiff will recover damages that the jury found were caused by him or her. By definition, as long as the entire verdict is reduced by the plaintiffs comparative fault, there is no chance that the plaintiff will recover damages the factfinder determined he or she caused. Likewise, there is no risk that, contrary to the provisions of LSA-R.S. 40:1299.41(1), the Fund will be made responsible for any sums except those arising from medical malpractice.
 

 Id.,
 
 p. 21, 848 So.2d at 572.
 

 For our purposes, the gravamen of the
 
 Hall
 
 decision is that a victim of medical malpractice is entitled to recover the full amount of his assessed damages up to the statutory cap caused by the fault of the healthcare provider and not by his own fault or the fault of a third party. La. R.S. 40:1299.39(F), the provision which mandates the reduction in the amount of the jury’s assessment of Mr. Flemings’ damages to $500,000, is a statute “which substantially impede[s] the ability of an injured party to obtain full recovery of his damages, [and is] in derogation of .^established rights and [is] to be strictly construed.”
 
 See Hall,
 
 pp. 17-18, 848 So.2d at 570;
 
 see also Ruiz v. Oniate,
 
 97-2412 (La.5/19/98), 713 So.2d 442, 444.
 

 The application of La. R.S. 40:1299.39(F) to the jury’s assessment of damages reduced the maximum amount of general and special recoverable damages to $500,000. Of that amount we have already concluded that the jury’s assessment of $165,000 in lost wages and reduced earning capacity was not manifestly erroneous. The balance on the statutorily mandated reduced award is $335,000. MCLNO does not argue that the jury’s assessments for general damage items totaling $310,000 are excessive.
 
 [9]
 
 Therefore, even before we would consider whether the jury’s assessment of Mr. Flemings’ damages for permanent scarring and permanent disability, we note that Mr. Flemings is entitled under the
 
 Hall
 
 rationale to collect not less than $475,000 from MCLNO.
 

 This would leave a mere $25,000 differential for compensating Mr. Flemings for the additional items of general damages to which he is unquestionably entitled. This remaining amount would hardly constitute an abuse of discretion when we consider “the particular injuries and their effects under the particular circumstances on the particular injured person.”
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257, 1260 (La.1993). The jury’s discretion in these matters, we are ever mindful, is vast.
 
 Id.
 
 at 1261. Even considering based upon the entire record the jury’s assessment of the award of all general damages globally, the general damages assessment, and
 
 a fortiori
 
 the amount recoverable by the judgment, “is not obviously the result of passion and prejudice, and it bears a reasonable relationship to the elements of the proved damages. This is not one of |gnthose exceptional
 
 *1233
 
 cases where the award is so gross as to be contrary to right reason.”
 
 Bailey v. Nunez,
 
 04-1603, p. 12 (La.App. 4 Cir. 3/2/05), 898 So.2d 589, 596. The reduction of the jury’s assessment of these items of general damages by the operation of law to $25,000 virtually makes the contention of MCLNO that the assessments were excessive inconsequential and moot.
 
 See Collins v. State, Louisiana Health Care Authority,
 
 99-2308, 99-2307, p. 11 (La.App. 4 Cir. 7/12/00), 774 So.2d 167, 174. Without a doubt, the $500,000 in damages recoverable by Mr. Flemings does not “shock the conscience.”
 
 See Taylor, supra,
 
 p. 28, 751 So.2d at 965.
 

 These assignments of error are also without merit.
 

 V
 

 We turn now to Mr. Flemings’ answer to the appeal of MCLNO. La. C.C.P. art. 2133(A) requires that an appel-lee who “demands damages against an appellant” must file a timely answer to the appeal, which Mr. Flemings did. La. C.C.P. art. 2164 provides in pertinent part that an appellate court “may award damages for frivolous appeal.” Though we have such authority, as was stated in
 
 Dupaquier v. City of New Orleans,
 
 271 So.2d 78, 80 (La.App. 4th Cir.1972)
 

 ... There are at least two reasons why that authority should be exercised only in rare instances. Those reasons are: (1) as is true in all penal statutes, the article must be strictly construed; and (2) appeals are favored and, unless the same are clearly required, penalties for frivolous appeal tend to discourage appeals.
 

 We adopt the recitation of
 
 Tillman v. Thrasher Waterproofing,
 
 00-0395, p. 8 (La.App. 4 Cir.3/28/01), 786 So.2d 131, 137 (ellipses indicate citations omitted):
 

 An appeal is frivolous if it does not present a substantial legal question, if the sole purpose of the appeal is delay, or if the appealing counsel does not seriously believe the view of the law that he advocates.... Appeals are always favored and, unless the appeal is unquestionably frivolous, damages will not be granted....
 

 1g1This court is reluctant to grant frivolous appeal damages because of the chilling effect it may have on the appellate process, and we decline to do so in this case. Based on the record, the parties’ briefs and oral arguments, the appeal is not unquestionably frivolous and damages are not warranted.
 

 VI
 

 Accordingly, the judgment of the trial court is affirmed. Damages for frivolous appeal are denied. All costs of appeal assessed to MCLNO.
 

 AFFIRMED.
 

 [1]
 

 . The jury also found that Mr. Flemings was not entitled to any award of future medical expenses.
 

 [2]
 

 . The jury awarded Mr. Flemings the sum of $90,000 for future lost wages.
 

 [3]
 

 . The jury and the judgment awarded $30,000 in past medical expenses. Under La. R.S. 40:1299.39(F) this amount is in addition to the statutory cap of $500,000. MCLNO has not appealed this award. The jury did not award any future medical expenses and, accordingly, the judgment is silent on future medical expenses.
 

 [4]
 

 . La. C.C. art. 2315 states in pertinent part: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” A person is also obliged to repair the damage caused by persons, things or animals for whom he is responsible.
 
 See
 
 La. C.C. arts. 2317
 
 et seq.
 
 Intentional and wilful acts can result in liability
 
 in solido.
 
 La. C.C. art. 2324(A).
 

 [5]
 

 . Such a special verdict form "shall” be given to the jury by the court when requested by a party.
 

 [6]
 

 . We are expressing no opinion on whether the issue of failing to mitigate
 
 must
 
 be raised under La. C.C.P. art. 1812(C) or whether it
 
 may
 
 be raised with special interrogatories under La. C.C.P. art. 1813.
 
 See
 
 the discussion at Dobbs, The Law of Torts, §§ 203-205 (West, 2000), and American Law Institute, RestateMENT OF THE LAW THIRD, TORTS: APPORTIONMENT OF Liability, § 50. The proper method of calculating reduction in a damage award for failure to mitigate seems to be an open question in comparative fault jurisdictions where the victim’s fault is post-injury.
 

 [7]
 

 . Judge Tate
 
 cited Annotation, Duty of injured person to minimize tort damages by medical or surgical treatment,
 
 48 A.L.R.2d at 37:
 

 The fact that a medical treatment recommended to minimize the effect of personal injuries would have involved the injured person in unreasonable expense or effort has been recognized in a number of cases as at least a factor affecting the determination whether, in refusing to obtain or submit to the treatment, plaintiff acted as a reasonably prudent man. The Restatement of Torts § 918, Comment e, recognizes that the duty to seek or follow medical attention may be modified where an unreasonable expenditure of money or effort would be required to repair the hurt or prevent further harm.
 

 [8]
 

 . This provision is comparable to La. R.S. 40:1299.39(F), the one applicable to this case.
 

 [9]
 

 . The unchallenged items of general damages include past and future physical and mental pain and suffering in the aggregated amount of $265,000 and past and future loss of enjoyment of life in the aggregated amount of $45,000.