MAX N. TOBIAS, JR., Judge.
In this appeal, the defendants, Charlotte Cummings (“Cummings”) and the Sewerage & Water Board of New Orleans (“S & WB”)(collectively referred to as “the defendants”), seek a decrease in the general damages awarded by the trial court to the plaintiff, Miguel Moody (“Moody”), for injuries he sustained in a collision, and a reversal of the award for future medical expenses. Moody answered the appeal seeking an increase in his general damage award. For the reasons set below, we affirm the trial court’s judgment.
An automobile accident occurred at the intersection of North Miro and Columbus Streets in New Orleans. Cummings, while working in the course and scope of her employment with the S & WB, backed up a S & WB vehicle she was operating in the wrong direction on a one-way street and collided with an automobile being driven by the plaintiff. Moody sustained injuries to his lower back, neck, and right knee as a result of the collision.
In his filed suit, Moody alleged the accident was caused by the sole negligence of Cummings while acting within the course and scope of her employment.[1]
Following a bench trial, the trial court rendered judgment in favor of Moody finding Cummings and the S & WB to be solely at fault for causing the accident and Moody’s injuries. The court determined that Moody sustained a partial tear of the medial collateral ligament in his right knee, three bulging cervical discs, and a five-to-six month soft-tissue injury to his lower back. The court awarded general damages to Moody, to-wit: $60,000.00 for the knee injury; $45,000.00 for the three cervical bulging discs; and $12,000.00 for the soft tissue injury to his back. Additionally, based upon the testimony of R. Vaclav Hamsa, M.D., Moody’s treating orthopedic specialist, because of ongoing *1058 complaints of right knee pain, the trial court determined that Moody is in need of arthroscopic surgery to stabilize the knee and rule out a possible partial tear of the medial meniscus and awarded future medical expenses of $29,200.00 for arthroscopic surgery. The court further awarded $13,113.17 in past medical expenses.[2]
On appeal, Cummings and the S & WB contend the general damages awarded to Moody are excessive and that the trial court manifestly erred in awarding damages for future medical expenses based on the evidence presented. They also contend that the medical testimony established that Moody failed to mitigate his damages for the injuries he allegedly sustained in the accident and that the damages awarded should be reduced accordingly.
In answer to the appeal, Moody argues the trial court committed manifest error when it failed to find, based on the testimony of Dr. Hamsa, that he actually sustained a medial meniscus tear in his right knee, a herniation of the C2-3 disc in his cervical spine, and the injury to his lumbar spine remained unresolved through the date of trial, over four years after the accident. Because the trial court was manifestly erroneous in its determination regarding the extent of his injuries, Moody avers the award for general damages should be exponentially increased.
On the day following the 2005 accident, Moody sought medical treatment for pain in his right knee, neck, and back. Moody continued to treat for complaints of intermittent pain in all three of these areas over the next four years. While the parties do not seriously contest that Moody sustained injuries to his right knee, neck, and back as a direct result of the accident, the extent and duration of these injuries is contested.
A trial court is vested with great discretion when awarding damages. Miller v. Lammico, 07-1352, p. 28 (La.1/16/08), 973 So.2d 693, 711. “An appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion.” Id. “It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of a particular injury to the particular plaintiff under the circumstances that the appellate court should increase or reduce the award.” Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Only then does the appellate court resort to prior awards, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). Accordingly, in affirming the trial court’s judgment, we address each injury separately.

The Right Knee Injury

For approximately six months following the accident, Moody was treated by Edmond E. Wood, M.D., for complaints of pain in his right knee. During that time, Dr. Wood found diffuse tenderness of the right knee, but objective tests were negative for effusion (fluid) or crepitus.[3] Moody also had a negative McMurray test.[4] Based on continued complaints of *1059 right knee pain, Moody underwent an MRI indicating a partial tear of the medial collateral ligament. The MRI showed no evidence of chondromalacia patella.[5] Moody was last seen for medical evaluation by Dr. Wood in July 2005, although he continued with physical therapy treatments to his knee for several more weeks thereafter.[6]
Moody presented to Dr. Hamsa in January 2006 with continued complaints of pain in his right knee. On examination, Dr. Hamsa noted effusion, patella femoral crepitus, and medial joint line tenderness in the right knee, all of which he related to the accident. Examination further revealed a positive McMurray test, indicating a possible medial meniscus tear. Dr. Hamsa further confirmed the diagnosis of a partial tear of the medial collateral ligament, which he determined had resolved by the time Moody first presented to him for treatment, but which he opined would continue to cause intermittent pain and swelling for the rest of Moody’s life. Beginning in 2006, when Moody’s complaints of right knee pain did not abate, Dr. Ham-sa recommended arthroscopic surgery to stabilize the right knee, examine the medial meniscus and repair the tear if necessary, shave the patella due to severe chon-dromalacia, and perform a lateral release. Moody continued to treat with Dr. Hamsa for ongoing pain related to his right knee | through the date of trial in March 2009. During that three-year period, Moody did not undergo the recommended arthroscopic surgery to his knee for reasons he related to work and his finances; he testified that he intends to have the surgery in the future.
Prior to trial, Moody underwent an independent medical examination by James Butler, M.D., an orthopedist, who testified that he physically examined Moody and reviewed all prior MRI films. As to Moody’s right knee, Dr. Butler agreed with Dr. Hamsa that the MRI suggested a previous partial tear of the medial collateral ligament, which had healed by January 2006.[7] On examination of the knee, Dr. Butler performed a McMurray test, which was negative, indicating to him that there was no evidence, clinically or on the MRI, of a medial or lateral meniscus tear, obviating any need for arthroscopic surgery to repair a possible tear or lateral release. Dr. Butler acknowledged that Moody demonstrated patella femoral crepitus on examination, which is consistent with a diagnosis of chondromalacia as was found by Dr. Hamsa, although he opined that the condition is developmental versus traumatic in nature, and thus, was not caused by the automobile accident.
The trial judge determined that the evidence supported a finding of a partial tear of the medial collateral ligament to Moody’s right knee which, though resolved, might intermittently cause swelling, pain, and discomfort over the remainder of Moody’s life. Regarding the diagnosis of chondromalacia patella, the court determined that Moody was enti- *1060 tied to the Housley presumption,[8] which was unrebutted by the defendants. Accordingly, the court held that the evidence supported the finding that this condition unequivocally suffered by the plaintiff was caused by the accident.
In Juneau v. Strawmyer, 94-0903 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, this court held that in order for a plaintiff to benefit from the Housley presumption of causation, three things must be established by a preponderance of the evidence: the plaintiff must (1) prove that he was in good health prior to the accident allegedly causing the plaintiffs injury; (2) show that subsequent to the accident, symptoms of the alleged injury appeared and continuously manifested themselves after the accident; and (3) demonstrate through medical evidence, circumstantial evidence, or common knowledge that there was a reasonable possibility of causation between the accident and the alleged injury. Id. at p. 6, 647 So.2d at 1299.
We agree with the trial court’s finding that Moody has presented sufficient unrebutted evidence to demonstrate that the development of chondromalacia patella in his right knee was more probable than not caused by the automobile accident. The defendants presented no evidence at trial indicating Moody experienced crepitus or chondromalacia in his right knee prior to the accident. Additionally, no evidence suggests that an intervening accident or incident may have caused the condition. While Moody’s original treating physician indicated his initial examinations were negative for crepitus in the knee and the initial MRI showed no evidence of chondromalacia, when Moody began treatment with Dr. Hamsa, a positive finding for crepitus was noted upon examination and continued to manifest itself over the next three years of treatment. Further, Dr. Butler confirmed crepitus during his independent evaluation, suggesting to him that Moody suffers chon-dromalacia patella.
While Dr. Butler testified that this condition is traditionally developmental versus traumatic and, in his opinion, was not caused by the automobile accident, Dr. Hamsa disagreed. Thus, the differing medical evidence concerning the nature and causation of Moody’s chondromalacia patella was irreconcilable and, we find, equally plausible. In such a circumstance, we follow the jurisprudence in Rosell v. ESCO, 549 So.2d 840 (La.1989) and Stobart v. State Through Dept. of Transp. & Dev., 617 So.2d 880 (La.1993), which states that where two permissible views of the evidence exists, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. The trial judge chose to accept Dr. Hamsa’s expert medical opinion that the trauma Moody experienced to his right knee in the accident caused him to develop chondromalacia patella. This finding is not clearly wrong.
The trial court further determined that the medical evidence did not support Dr. Hamsa’s supposition that Moody actually sustained a torn medial meniscus in his right knee. Despite the plaintiffs argument to the contrary, based *1061 upon our review of the record, we agree. The appellate court standard of review for a factual finding is that of manifest error or clearly wrong. Todd v. Delta Queen Steamboat & Co., 07-1518, p. 4 (La.App. 4 Cir. 8/6/08), 15 So.3d 107, 111. However, if a trial court’s findings of fact are not reasonable in light of the record reviewed in its entirety, then a court of appeal may reverse. Id. 07-1518, p. 4. 15 So.3d at 111. In the case at bar, the MRI evidence did not confirm a torn meniscus in Moody’s right knee and the McMurray tests by various physicians did not consistently yield positive results. Moreover, Dr. Hamsa repeatedly testified that he wanted to move forward with the arthroscopic surgery specifically to rule out a torn medial meniscus. In consideration of the standard of review, we do not find the trial court erred in making its finding of fact. We find that the trial court’s determination that Moody did not actually sustain a torn medical meniscus was reasonable based on the medical testimony in the record.
Next, the trial court held that, due to Moody’s continued complaints of difficulty and pain in his right knee four years after the accident, the recommendation for arthroscopic surgery was reasonable. We agree. Dr. Hamsa recommended the surgery to rule out a torn medial meniscus and to repair it if necessary, shaving of the patella due to the severe chondromalacia, and performing a lateral release. While Dr. Butler disagreed with Dr. Hamsa’s recommendation for surgery, even though he confirmed the chondromalacia patella diagnosis, he agreed that it would not be unreasonable to perform arthroscopic surgery on Moody’s knee even if based only on his ongoing subjective complaints.' Moody testified that he intends to undergo the recommended arthroscopy. Based on the record evidence and medical testimony, we find the trial judge was not manifestly erroneous in ruling that arthroscopic surgery is warranted under the facts and circumstances presented.
9 The record establishes that Moody suffered a partial tear of the medial collateral ligament and chondromalacia patella in his right knee as a result of the accident. A future arthroscopic surgery is necessary. He has suffered pain in his knee from February 2005 to the date of trial, a period of over four years, and will likely continue to experience intermittent pain and discomfort for the rest of his life. We find that the trial court did not abuse its discretion in awarding Moody $60,000.00 for his knee injury.[9]

The Neck Injury

Moody initially treated with Dr. Wood due to complaints of pain in his neck for approximately six months following the accident during which time his cervical complaints progressively improved with physical therapy. Over that six-month period, physical exams revealed mild to moderate diffused pain, objective spasm and limited range of motion in the neck. Moody was last treated by Dr. Wood for neck pain in August 2005.
In January 2006, Dr. Hamsa took over Moody’s treatment. Moody reported continued neck pain radiating into his shoulders and upper arms. On exam, Moody indicated aching, a decreased range of motion, tenderness, and radicular pain on the right. Dr. Hamsa diagnosed discogenic cervical sprain for which he prescribed medication. Moody’s neck pain apparently *1062 improved with ongoing medication over the next year, but flared up again in January 2007, at which time he underwent a cervical MRI. According to the radiologist’s report, the MRI revealed bulging discs at C2-3, C4-5, and C5-6 with no evidence of disc herniation. Because of continued complaints of pain radiating from the neck, Dr. Hamsa recommended cervical epidural injections to alleviate the pain.[10] Eventually, because Moody’s subjective complaints did not subside, Dr. Hamsa recommended an EMG and nerve conduction studies to rule out nerve root involvement. The results of the studies were reported to be normal showing no cervical nerve root impingement or other neuropathic process affecting the upper extremities. Moody continued to complain of cervical symptoms through the date of trial.
The trial court determined that Moody sustained three bulging discs in his cervical spine or an aggravation of pre-existing asymptomatic cervical disc disease as a result of the accident and awarded $45,000.00 for this injury. The defendants argue this amount is too high. To the contrary, the plaintiff avers the award is too low because the trial court manifestly erred when it failed to find that Moody suffered not only two bulging discs at C4-5 and C5-6, but that he also proved he had a disc herniation at C2-3 caused by the accident.
In his deposition prior to trial, Dr. Ham-sa testified that his review of the MRI films showed no evidence of herniation or tear in the annulus in the plaintiffs cervical spine. He noted degeneration of the cervical spine that, in his opinion, is degeneration due to injury. At trial, however, Dr. Hamsa was presented with a larger or blown-up view of the MRI film, and testified that, in his opinion, there is evidence of an actual herniation at the C2-3 disc.[11] He further testified that the “significant protrusion” at C2-3 is now starting nerve root irritation, causing Moody to experience trapezius spasm despite the normal findings of the EMG and nerve conduction studies. Dr. Hamsa also believes there is C5-6 nerve root irritation involving the component into Moody’s right upper arm, based upon Moody’s subjective complaints. He opined that these cervical components were causing Moody to experience nuchal headaches. And while Dr. Hamsa testified that his prognosis for Moody’s neck is fair, he predicts Moody will likely experience pain in his neck for the rest of his life.
Dr. Butler acknowledged the MRI films showed minimal bulging at C2-3, C4-5, and C5-6, which appeared to be degenerative, and not traumatic in origin. Both Dr. Butler and Daniel Trahant, M.D. (who conducted the EMG and nerve conduction studies), agreed the bulges were not causing any spinal cord or nerve root encroachment.
We find the trial judge was not manifestly erroneous in rejecting Dr. Hamsa’s supposition of a cervical disc herniation or nerve root involvement in Moody’s cervical spine. Neither the MRI report nor the normal results of the EMG and nerve conduction studies support his findings. The MRI film supports the trial judge’s conclusion that Moody has three bulging discs in his cervical spine, which were either caused by the subject accident or were pre-existing and aggravated by *1063 the accident. Moody has continuously suffered neck pain for a period of over four years and, according to Dr. Hamsa, will likely continue to experience cervical pain for the rest of his life. Accordingly, we find that an award of $45,000.00 to Moody for injuries to his neck was not an abuse of the trial court’s vast discretion or that such an award is excessive under the facts and circumstances of this case.

The Lumbar Injury

¶ The plaintiff alleges the trial court manifestly erred when it determined that Moody suffered a five-to-six month sprain to his lumbar spine based upon the undisputed evidence showing he has continuously experienced back pain for over a four-year period as a result of the accident. Concomitantly, he seeks an increase in the $12,000.00 award given. We disagree and affirm the trial court’s ruling.
The medical records and trial testimony confirm that within five to six months following the accident, the soft-tissue injury to Moody’s lumbar spine had resolved. While the record does indicate that Moody continued to occasionally complain of pain in his back even up to four years later, at trial Dr. Hamsa related this lingering back pain directly to Moody’s gait or way of walking as he attempts to compensate for the injury to his right knee and not as a result of any specific lumbar abnormality. As this continued back pain is actually a sequela of his knee injury, we find the $60,000.00 awarded to him for the knee injury also encompassed any referred pain experienced in his back as a result of the knee.
Accordingly, we find $12,000.00 adequately compensates the plaintiff for the five-to-six month soft-tissue injury to his lumbar spine. This assignment of error is without merit.

Mitigation of Damages

The defendants assign as error the trial court’s failure to reduce Moody’s general damage award consistent with the evidence that he failed to mitigate his damages. Specifically, Cummings and the S & WB contend Moody failed to mitigate his damages by failing to undergo the recommended arthroscopic surgery of the knee and epidural cervical injections prior to the time of trial, and for failing to take his medication as he prescribed. We disagree.
La. C.C. art.2002 provides that “[a]n obligee must make reasonable efforts to mitigate the damage caused by the obli-gor’s failure to perform,” and when he does not, “the obligor may demand that the damages be accordingly reduced.” A tort victim has an affirmative duty to make every reasonable effort to mitigate his damages, but the care and diligence required of him is the same as that which would be used by a person of ordinary prudence under the circumstances. Campbell v. Robinson, 08-1429, p. 5 (La.App. 4 Cir. 4/8/09), 10 So.3d 346, 349. This duty requires that the injured party take reasonable steps to minimize the consequences of the injury. Dixie Services, L.L.C. v. R&B Falcon Drilling USA, Inc., 05-1212, 06-1209, p. 6 (La.App. 4 Cir. 3/21/07), 955 So.2d 214, 219. However, Louisiana law is clear that the expense and inconvenience of treatment are proper factors underlying a person’s refusal of treatment. See Kuck v. City of New Orleans, 531 So.2d 1142, 1144 (La.App. 4th Cir.1988). Additionally, an injury victim does not fail to mitigate his damages when he refuses to undergo treatment which would not significantly alleviate his disability, carries risks of failure, when the treatment is painful, or when he is unable to pay for the treatment. Flemings v. State, 07- *1064 1290, p. 17 (La.App. 4 Cir. 8/26/09), 19 So.3d 1220, 1231.
Moody testified that due to economic restraints he has had to delay having the recommended arthroscopic knee surgery. The record establishes that Moody started a new job following the accident and has made efforts to accrue sufficient vacation time and/or sick leave in order to accommodate the anticipated four to six weeks he would need to be off of work while recuperating from the surgery. He stated he did not have adequate financial reserves to support himself for the entire projected recovery period. The trial judge found Moody’s explanation to be reasonable under the circumstances. We find no manifest error in this determination.
Moody also testified that he was concerned about undergoing the painful epidural injections because he was advised that the injections would only provide temporary relief from the pain in his neck. As this court stated in Flemings, supra, it does not constitute a failure to mitigate when an injury victim refuses to undergo painful treatment which would not significantly alleviate his disability.
Lastly, regarding the defendants’ allegation that Moody failed to mitigate his damages because he refused to take his medication as prescribed, the court found that while Moody might not have been taking his medication consistently, the inconsistency was most likely due to his job restrictions which prohibits the use of prescription pain or muscle-relaxant medication while employed and requires regular drug testing. The trial judge found Moody’s explanation to be reasonable. We agree and find no merit to this assignment of error.

Future Medical Expenses

In their last assignment of error, Cummings and the S & WB contend there is no evidence in the record to support an award for future medical expenses of $29,200.00. Specifically, the defendants aver that Dr. Hamsa, whose estimated fees the court relied upon when making the future medical expense award, testified that he is not going to be the physician to perform the recommended surgery. Consequently, the defendants argue the estimated amounts testified to by Dr. Hamsa are insufficient upon which to support a future medical expense award. We disagree.
At the outset, we note that the proper standard to determine whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence that the future medical expenses would be medically necessary. Hoskin v. Plaquemines Parish Government, 97-0061, p. 6 (La.App. 4 Cir. 12/1/97), 703 So.2d 207, 211. We previously concluded that Moody proved the necessity for arthroscopic surgery to his right knee and Moody testified that he intends to have the surgery. Consequently, it follows that Moody will incur future medical expenses for the surgery.
In Clarkston v. Louisiana Farm Bureau Cas. Ins. Co., 07-0158 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, this court articulated the standard for awarding future medical expenses:
Future medical expenses need not be established with mathematical certainty although a plaintiff must prove that it is more probable than not that expenses will be incurred ... Although a plaintiff is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record ... If the fact finder can determine from past medical expenses or other evidence a minimal amount that reasonable minds could agree upon, then the award is proper. [Citations omitted.]
Id. at p. 34, 989 So.2d at 187-88 (quoting Molony v. USAA Prop. & Cas. Ins. Co., *1065 97-1836, pp. 2-3 (La.App. 4 Cir. 3/4/98), 708 So.2d 1220, 1221-22).
Dr. Hamsa estimated at trial that the surgeon fees associated with the recommended arthroscopic surgery would approximate $11,700.00 and the hospital charges would be $17,500.00, for a total fee of $29,200.00. While Dr. Hamsa did testify that he no longer performs surgery and would not likely perform Moody’s arthroscopic surgery, he described these estimated fees and charges to be in the “ballpark” of what other physicians and facilities would charge for the same procedure. See Dawson v. City of Bogalusa, 95-0824, p. 8 (La.App. 1 Cir. 12/15/95), 669 So.2d 451, 455 (A physician’s testimony providing a “ballpark figure” for estimated hospital costs was sufficient to affirm a future medical expense award.).
Considering the foregoing, we find no merit to the defendants’ claim that the award for future medical expenses was not supported by the record; thus, the fact finder’s future medical expenses award was not manifestly erroneous and decline to disturb it. See Logan v. Brink’s Inc., 09-0001, pp. 14-15 (La.App. 4 Cir. 7/1/09), 16 So.3d 530, 541-542.

Conclusion

For the foregoing reasons, the trial court judgment is affirmed.

AFFIRMED.

BELSOME, J., Concurs with Reasons.

. While the defendants did not stipulate to liability for the accident, liability was not a contested issue at trial.

. Neither party has appealed the award for past medical expenses.

. Typically, crepitus is a grinding noise coupled with a sensation in the affected joint. Crepitus can occur with or without pain.

. The McMurray test is used to evaluate individuals for tears in the meniscus of the knee. It is a rotation test for demonstrating torn cartilage of the knee. A positive test is an indicator for a tear of the meniscus.

. Chondromalacia patella is the softening and degeneration of the tissue (cartilage) underneath the kneecap (patella). A grating or grinding sensation (crepitus) when the knee is extended and knee tenderness are signs of this condition.

. The record indicates that following Hurricane Katrina, Dr. Woods’ medical office was destroyed and Moody was displaced to Texas. Moody did not return to the New Orleans area until January 2006, at which time he renewed treatment for his injuries with Dr. Hamsa.

. Dr. Butler confirmed that the partial tear of the medial collateral ligament, even though healed, might cause Moody intermittent pain and discomfort for the rest of his life.

. In Housley v. Cerise, 579 So.2d 973, 980 (La.1991), the Louisiana Supreme Court, quoting Lucas v. Insurance Company of North America, 342 So.2d 591, 596 (La.1977), stated the legal presumption of causation as follows:
A claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.

. We find the case, Stewart v. Ice, 07-0871 (La.App. 4 Cir. 4/9/08), 982 So.2d 928, cited by the plaintiff is substantially and factually distinguishable from the injuries sustained by Moody.

. Moody declined to undergo the procedure.

. Specifically, Dr. Hamsa testified that he viewed elevation of die ligament and dural indentation at C2-C3. In his opinion "there appears to be a small HIZ piece of disc material ... in the annulus. [T]he only way you can do that is to tear it. If you tear it, it’s a rupture.”